777 A.2d 418

**Cornelius F. MURPHY, Jr., Appellant,**

**v.**

**DUQUESNE UNIVERSITY OF THE HOLY GHOST, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 2001.

Decided July 17, 2001.

Reconsideration Denied Sept. 6, 2001.

Zappala, J., filed a concurring opinion.

574

Samuel John Cordes, Philip A. Ignelzi, Pittsburg, for Cornelius F. Murphy, Jr.

Martha Hartle Munsch, Pittsburg, Linda S. Drago, for Duquesne University.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE and SAYLOR, JJ.

## OPINION

CAPPY, Justice.

Following the termination of his employment as a tenured law professor, the Appellant, Cornelius F. Murphy, Jr., ("Murphy"), sued the Appellee, Duquesne University of the Holy Ghost (the "University"), for breach of the parties' tenure contract. Murphy appeals from the order of the Superior Court affirming the trial court's entry of summary judgment in the University's favor. We granted allocatur to determine the applicable standard of review. We conclude that the standard of review that governs on appeal from the grant of a motion for summary judgment in any breach of contract action between private parties applies to Murphy's claim. We also conclude that the University is entitled to summary judgment, albeit for reasons that differ from those relied upon by the court below. Accordingly, we affirm the Superior Court's order.

The material, undisputed facts of record are as follows. The University is a private, ecumenically-oriented, Catholic institution established in 1878 by the Fathers of the Congregation of the Holy Ghost and of the Immaculate Heart of Mary. According to Section 2 of the University's Faculty Handbook as prepared in 1986 (the "Faculty Handbook"), the University's stated mission is to prepare its students "intellectually, professionally, aesthetically, spiritually, and ethically for the ordinary responsibilities of life and for leadership in a free, complex, and changing society. ...." Its goals as stated therein are to: offer undergraduate students a well-rounded and broad education; enable students to develop an expertise in certain disciplines; prepare advanced students for careers; preserve the record of human thought; engage students in the discussion and study of religious and ethical values, "especially those of the Judaeo–Christian tradition in its Catholic dimension"; maintain an institution which is responsive to the needs of the community; and create an atmosphere appropriate to a moderately-sized community of scholars which encourages close faculty-student relationships.

In 1966, the University hired Murphy to teach in its School of Law. In September of 1967, the University awarded tenure to Murphy.

At all relevant times, tenured status at the University was afforded by contract. The Faculty Handbook expressly stated that certain of its Sections (Sections 1 though 18) constituted part of a faculty member's contractual relationship with the University. One of those Sections set forth Statute IV from the University's 1985 Statutes (the "Statutes") in its entirety. Statute IV, dedicated to the University's faculty, governed the award and loss of tenure. Under Statute IV. J., Murphy was entitled, as a tenured faculty member, to renewal of employment until retirement or age 70.[1] Under Statute IV. K.1.,

1. From statements of record made by both parties, it would appear that a letter or other document of employment renewal was executed annually by the University and a faculty member with tenure. The renewal would contain terms specific to a particular school year and would incorporate by reference the terms of relevant materials, such as the Faculty Handbook and Statutes. The record contains only the letter

Murphy could forfeit tenure by serious misconduct or for professional incompetence, and was provided a process that had to occur before employment could be terminated.

On August 1, 1989, the University reaffirmed and distributed its written policy prohibiting sexual harassment. In the fall of 1991, a first-year law student, Bonita Lynch ("Lynch"), who was taking one of Murphy's courses, filed a sexual harassment complaint against him. Lynch accused Murphy of assault and unwelcome physical advances, and claimed that he had inappropriately assisted her in law school assignments. Lynch subsequently filed a lawsuit against Murphy and the University in federal district court asserting violations of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"),[2] and several pendant state-law claims.

Dr. Judith Griggs, Duquesne's Affirmative Action Officer, investigated Lynch's allegations, and in December 1991, issued a report to Dr. John E. Murray, Jr. ("Murray"), the University's President. Dr. Griggs found that Murphy had involved himself both emotionally and physically with Lynch, thereby creating a hostile and intimidating environment with which she was forced to contend. Dr. Griggs also concluded that Murphy's conduct was inconsistent with the moral standards of the University and the ethical standards of its professorate.

After receiving the report, Murray notified Murphy in a letter dated December 5, 1991 that he accepted Dr. Griggs' findings and conclusions, and viewed Murphy's behavior as a clear violation of both the University's basic philosophy and its sexual harassment policy. Murray informed Murphy that he would be permitted to complete his teaching assignments that semester, but would then be suspended until June 1, 1992. Murray directed Murphy to seek professional counseling to

the parties executed for the 1993–94 academic year, as well as the documents it incorporated, which was the latest embodiment of the parties' tenure agreement, and to which we refer in this opinion as the "Contract". *See* page 422, *infra.*

2. Title IX prohibits sex discrimination in any educational program or activity receiving federal financial assistance.

insure that he would not engage in any such conduct during the suspension, and warned that the University would take immediate and appropriate action if information of additional or similar past misbehavior came to light.

Accepting the terms of suspension, Murphy sought counseling and provided the University with reports of his progress. Ultimately, Murphy's counselor advised the University that he had benefited from the counseling and would conform his conduct in the future to University standards.

By letter dated June 4, 1992, Murray informed Murphy that his suspension was lifted and that his status as a tenured professor was reinstated.

Consequently, Murphy returned to teaching for the 1992–93 academic year. Pursuant to a letter from then Dean of the Law School, John J. Scullio dated June 2, 1993, the University offered to renew Murphy's employment for the 1993–94 school year. Murphy accepted the University's offer on or about June 8, 1993. In addition to incorporating the Statutes and the Faculty Handbook, the letter stated that the Standards of the American Bar Association for Legal Education ("ABA") and the Articles of the Association of American Law Schools ("AALS") that were applicable to law schools and law faculties were to be incorporated by reference into the parties' agreement (the "Contract").

In the summer of 1993, however, attorneys representing Ms. Lynch notified the University that Murphy had engaged in a pattern of misconduct, harassing Ms. Lynch, as well as several other female law students. Based on these assertions, the University felt compelled under Title IX to reopen its investigation of Murphy's activities. In August 1993, the University did so, and placed Murphy on paid leave.

Subsequently, the University's Law School Dean sent Murray a memo dated October 11, 1993, requesting that a process be initiated to terminate Murphy's tenure and listing several allegations of Murphy's serious misconduct. By letter dated October 25, 1993, Murray notified Murphy that the University proposed to terminate his employment as a tenured professor

pursuant to Statute IV K.1. of the Contract. Murphy was also advised of his entitlement under Statute IV to a hearing before the University Grievance Committee for Faculty (the "Committee"), and of the several grounds for the proposed termination.

As was his right, Murphy requested a formal pre-termination hearing, which was held for two full days in May 1994. Murphy was represented by counsel, who cross-examined the University's witnesses and called witnesses and offered exhibits on Murphy's behalf. Four women, all law students who had taken one of Murphy's courses, testified about their respective encounters with Murphy in 1989, 1990 or 1991. Because of her pending federal action, Ms. Lynch chose not to testify.

After the hearing concluded, the Committee submitted a report dated December 21, 1994 with its findings, conclusions and recommendation (the "Report") to Murray. Based on the evidence presented, the Committee made several findings, unfavorable to Murphy, determining that he attempted to form relationships with female law students who rebuffed him, created an atmosphere in which female law students were made to feel uncomfortable, effectively foreclosed female law students from taking certain courses he taught, abused his power as a professor in dealing with female law students, provided substantial and improper academic advisement as a quid pro quo in the context of sexual harassment, pursued conduct of repetitive approaches to women which was offensive, and was apparently reluctant to comprehend the ethical and legal principles involved. Nevertheless, reasoning that much of the evidence against Murphy had been available to the University when Lynch first filed her complaint in 1991, the Committee recommended against Murphy's termination on the grounds of laches.

Under the Contract, the final decision in this matter was given to Murray, as the University's President. Accordingly, Murray made a thorough review of the Report, and advised the Committee in writing on January 4, 1995 of his final decision. Murray informed the Committee that he was in

substantial agreement with its substantive findings, but that he disagreed with its process concerns. Murray explained that the record did not support the application of the doctrine of laches. Murray then concluded that "[t]he University has, by abundantly clear and convincing evidence, established more than sufficient grounds to support the finding of serious misconduct by Professor Murphy and consequent termination of Cornelius F. Murphy, Jr. as a tenured professor at Duquesne University."

On the same day, Murray wrote to Murphy, notifying him that he had made the final decision to terminate him as a tenured member of the University's faculty. As permitted under the Contract, Murphy appealed Murray's decision to Duquesne's Board of Directors. Upon its review of Murray's point-by-point response to Murphy's appeal, at its regular meeting on February 17, 1995, the Board approved a motion, recognizing, *inter alia,* that "the President had the authority to terminate the employment of Professor Murphy pursuant to the powers granted to him in the University Bylaws and Statutes", and accepting "the conclusions and final decision of President Murray" to terminate Murphy's employment.

Murphy filed a complaint in the United States District Court for the Western District of Pennsylvania against the University, asserting in Count I, a claim of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a); in Count II, a claim of age discrimination under the Pennsylvania Human Relation Act, ("PHRA"), 43 P.S. § 951 *et seq.;* and in Count III, a claim for breach of contract. With respect to the latter, Murphy alleged that the University's termination of his employment violated the Contract because he did not engage in serious misconduct and because he did not receive the process of tenure termination that the Contract promised.

The University moved for summary judgment. In July 1998, the district court granted the motion as to Murphy's ADEA claim, and declined to retain jurisdiction over Murphy's state law causes of action. Thereafter, Murphy had his case

transferred to the Court of Common Pleas of Allegheny County, and voluntarily discontinued his PHRA claim.

On August 12, 1998, the University filed a motion for summary judgment on Count III, Murphy's breach of contract claim. The trial court granted the University's motion. The trial court's decision was premised on its determination that the claim was not subject to "*de novo*" review because a court should not intrude into a university's operations. Essentially, the trial court decided that even if material facts were genuinely in dispute, Murphy was not entitled to have a "new factfinder (this time Allegheny County residents rather than Dr. Murphy's colleagues) . . . . re-visit the evidence and determine what happened between Professor Murphy and the students." (Trial Court Opinion at 12.) Instead, based on its interpretation of two Ohio cases, *Brahim v. Ohio College of Pediatric Medicine,* 99 Ohio App.3d 479, 651 N.E.2d 30 (1994), and *Yackshaw v. John Carroll University Bd. of Trustees,* 89 Ohio App.3d 237, 624 N.E.2d 225 (1993), the trial court concluded that it should determine whether "a reasonable person could dispute that the record compiled by the factfinders in this case contains substantial evidence of serious misconduct by Professor Murphy." *Id.* at 17. The trial court concluded that no such dispute existed. *Id.*

The trial court turned next to Murphy's allegation that the University committed a procedural breach of contract for terminating him for misbehavior that occurred prior to his 1991 suspension or prior to the June 2, 1993 renewal of employment letter, without reserving the right to do so.[3] The

---

3. As the trial court pointed out, Murphy's argument was not clearly developed. At times Murphy argued that the University's breach consisted of its considering misconduct that occurred prior to the 1991 suspension, while at other times, he argued that it consisted of its considering misconduct that occurred prior to the June 2, 1993 renewal letter. (Trial Court Opinion at 18 & n. 1). We also observe that at times, Murphy made this argument only with regard to conduct about which the parties allegedly had knowledge as of June 1993.

Moreover, Murphy conflated his position in this regard with the allegation that he could not be suspended and lose tenure for the same misbehavior. The later allegation was based on the applicability of AALS Standards or Bylaws to the parties' tenure relationship. While

trial court rejected Murphy's allegation for several reasons: the Contract contained no procedural term that stated that "conduct occurring prior to the latest contract renewal [was] barred by some sort of statute of limitations unless preserved in writing"; Murphy's contention was an unreasonable interpretation of the University's contractual rights; Murray's December 5, 1991 letter specifically notified Murphy at the time he was suspended that the University would take further action if it learned of similar past misbehavior and did not suggest that Murphy's suspension would expunge all pre-suspension misconduct; and that collateral estoppel precluded the litigation of allegations of procedural breach. *Id.* at 18–22.

With regard to collateral estoppel, the trial court noted that in the federal action, Murphy attempted to meet his burden of proving age discrimination by asserting that the University's proffered reason for his termination was pretextual, as evidenced by its failure to conform to its own policies and procedure. After reviewing the elements of the doctrine, and finding them met, the trial court held that the district court's ruling that "the process employed in seeking out the truth concerning the charges was in accordance with established contractual provisions and University policy and procedure, which roughly comported with due process of law" precluded Murphy from re-litigating the issue. *Id.* at 22–24 (quoting District Court Memorandum Opinion at 23).

Murphy appealed to the Superior Court. A divided panel of the court affirmed. *Murphy v. Duquesne University of the Holy Ghost,* 745 A.2d 1228 (Pa.Super.1999).

The Superior Court's majority first addressed the standard of review question. Acknowledging that Murphy was entitled to some review, but reasoning that Pennsylvania case law favors limited judicial review of internal university decisions, *id.* at 1233, the majority articulated a deferential standard that it determined ought to apply to this case: "We do not conclude that *no* review is appropriate, or that the Universi-

the trial court did not specifically address Murphy's contention regarding the applicability of AALS materials to the events at issue, the Superior Court did so, and rejected it. *See* page 425 & note 13, *infra.*

ty's grievance procedure is Professor Murphy's exclusive binding forum. However, we must accord deference to a private institution's internal factfinding and appeals procedure, if they comport with due process." *Id.* at 1234 (emphasis in original). In a footnote to this passage, the majority pointed out that the " 'essential elements of due process are notice and opportunity to be heard and to defend oneself in an orderly proceeding adapted to the nature of the case. . . . . Due process also requires an opportunity to confront and examine witnesses.' " *Id.* n. 2 (quoting *Lewis v. School District of Philadelphia,* 690 A.2d 814, 816 n. 12 (Pa.Cmwlth.1997)).

Applying its standard, the majority stated:

While Professor Murphy did not have the opportunity to cross-examine Ms. Lynch, the record suggests her evidence alone would not have been dispositive. President Murray focused on th̲ ᴇ ᵗestimony of the four students, on the *pattern* of conduct, and the evidence that Professor Murphy abused the power of his role as a professor, creating a hostile environment for female law students. It was the testimony of the four other students that demonstrated the pattern of behavior and the environment it created. While Professor Murphy admitted improperly doing academic work for Ms. Lynch, it was not merely the allegations of the absent Ms. Lynch that led to President Murray's decision.

*Id.* at 1234 (emphasis in original).

The majority then evaluated and approved of the trial court's "substantial evidence" standard, and agreed with its application:

While the term "serious misconduct" is not defined in the contract or University Statutes, the trial court determined "No reasonable person could dispute that the record compiled by the factfinders in this case contains substantial evidence of serious misconduct by Professor Murphy." Trial Court Opinion, at 17. Upon a thorough review of the record, we agree. The record contained substantial evidence of a pattern of conduct that by any reasonable definition constitutes "serious misconduct", particularly

when committed by the authoritative figure of a law school professor against first-year students. The factual findings of Professor Griggs and the committee, the extensive analysis of the evidence by President Murray, together with Professor Murphy's own admissions and testimony adequately support the trial court's conclusion.

*Id.*

The majority next affirmed the trial court's decision on a variety of issues, and found several other issues either immaterial or insufficient to preclude summary judgment, all without discussion. *Id.* at 1234–35.[4]

The majority then considered and rejected Murphy's contention that summary judgment was improper because the University failed to adhere to AALS Bylaws or Standards concerning academic freedom and tenure, determining that the AALS Articles of Association, not the Bylaws or Standards, were part of the Contract. *Id.* at 1235.

Finally, concluding that "[b]oth the federal and state actions necessarily involved an examination of the University's termination proceedings to determine whether they were arbitrary and non-compliant with the University Statutes, Faculty Handbook and the contract", the majority ruled that the trial court did not err in applying the doctrine of collateral estoppel to Murphy's allegations of procedural breach. *Id.* at 1237.

The Superior Court, therefore, affirmed the trial court's grant of the University's motion for summary judgment.[5] This appeal followed.

---

**4.** These issues were: whether serious misconduct could include conduct allegedly known to the parties when their agreement was formed; whether the Committee found that the standard of serious misconduct was met; whether Murray's December 1991 letter restricted Murphy's rights; whether one of the law students who testified before the Committee was credible; whether the University terminated Murphy to protect its position in Lynch's lawsuit; and whether an opinion from the AALS on Murphy's termination precluded the entry of summary judgment. *Id.* at 1234–35. Except for the assertion that his actions did not rise to the level of serious misconduct, Murphy has not preserved these issues in the present appeal.

**5.** The dissent believed that the trial court erred in applying a limited standard of judicial review and would have used the typical standard on

First, we consider the threshold and significant question this case raises: What standard of review applies to Murphy's claim for breach of contract? Is it, as Murphy contends, the standard that would be applied in any contract case on appeal from the grant of summary judgment or is it, as the University argues, a different and restricted standard, like the standards the lower courts respectively adopted?

Our answer to this question commences with an evaluation of the Superior Court's basic premise-since the law in the Commonwealth favors limited judicial review of internal college or university decisions, *id.* at 1233–34, n. 1, a restricted standard must be applied in the present case. We turn to the case upon which the Superior Court primarily relied for its guiding premise, our decision in *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987). Because of *Baker's* importance to our analysis, we discuss it in detail.

In *Baker,* the appellant accepted a teaching position in the Art Department of Lafayette College ("College") under a written two-year contract. The faculty handbook, which was incorporated into the contract, set forth a procedure that the College was bound to follow in deciding whether it would reappoint the appellant when his initial term expired. That procedure provided for annual written evaluations of the appellant's performance by the Art Department's chairman, as well as several levels of internal appeal from an unfavorable decision. After reviewing the evaluations made of the appellant, the College declined to reappoint him. Once the process of internal appeals was completed, upholding the decision against reappointment, the appellant sued the College for defamation and for breach of contract. As to the latter, the appellant alleged that the College violated his employment

summary judgment. *Murphy,* 745 A.2d at 1241–43. (Brosky, J., dissenting). The dissent further believed that questions of material fact existed as to whether Murphy engaged in serious misconduct and that, therefore, the University's motion for summary judgment should not have been granted. *Id.* at 1243. Lastly, the dissent believed that the trial court erred in applying collateral estoppel on the grounds that Murphy was not afforded in federal court a full and fair opportunity to litigate whether or not the process extended to him complied with the Contract. *Id.* at 1243–45.

agreement by not acting in good faith in considering his reappointment.[6] The College filed a motion for summary judgment on the breach of contract claim, which the trial court granted.

On appeal, the Superior Court affirmed. *Baker v. Lafayette College*, 350 Pa.Super. 68, 504 A.2d 247 (1986). After agreeing with the appellant that the College was required to perform its contractual duties in good faith, the court reviewed the record to assess the College's performance in deciding against his reappointment. The court concluded that the undisputed facts showed full compliance with the process of evaluation and appeal that was laid out in the parties' contract. Moreover, the court found no evidence of bias, arbitrariness, misrepresentation or other sharp practice on the College's part in any aspect of the process. Accordingly, the court held that the appellant's breach of contract claim failed, and that summary judgment in the College's favor was proper. *Id.* at 255–57.

At the same time, the Superior Court noted that the appellant was essentially attempting to secure through a breach of contract action a *de novo* review of the College's decision not to reappoint him. Determining that the terms of the parties' contract gave to the College the exclusive right to decide matters of reappointment, the court rejected such efforts, stating:

> Under the guise of "good faith," Baker would have us conduct a de novo review of the College's decision not to renew his contract. We decline Baker's invitation to reexamine the merits of the College's decision .... because we hold that the only reasonable construction of the contract between the parties is that at all times the College retained its sole discretion to decide whether to reappoint Baker. .... Therefore, upon finding, as we have, that the College

---

**6.** The appellant also alleged in his breach of contract claim that he had an enforceable right to renewal of his two-year contract. This allegation was found by the lower courts to have no merit. *Baker,* 504 A.2d at 253–55. As this aspect of the *Baker* case is not relevant to the issues raised in this appeal, we do not discuss it.

performed all its contractual obligations fully and in good faith, the terms of the contract require that our inquiry end. *Id.* at 256.

This court, in turn, affirmed the Superior Court's judgment. In doing so, we stated:

> [T]he [appellant] argues that the College breached his employment contract by not evaluating his performance in "good faith." Since the college was aware of the chairman's distaste for the [a]ppellant, the [a]ppellant argues that the College was responsible to conduct an independent review of the [a]ppellant's performance. .... As in all aspects of life, no procedure is fool proof. In our judicial system we have various appeals to review lower court determinations alleged to be improper or unwise. The purpose of appellate review is to correct any prior wrongdoings. Likewise, *The Faculty Handbook* sets forth the review procedures. In accordance with these procedures the [a]ppellant appealed to the president of the College and ultimately to the board of trustees. *We would be hardpressed to conclude that the College acted in bad faith when it followed the required review procedures. This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures.*

*Baker,* 532 A.2d at 403 (emphasis added).

In the present case, the Superior Court quoted this passage from *Baker* and relied on its last sentence when it determined that Pennsylvania jurisprudence calls for restricting judicial review of internal university decisions. *Murphy,* 745 A.2d at 1233. When our holding in *Baker* is read in context, however, it is clear that the Superior Court's reliance is mistaken. The Superior Court's error is most obviously demonstrated by the fact that when we decided *Baker,* we applied the traditional standard of review on an appeal from the grant of a motion for summary judgment that is used in any contract case, even though a college's internal decision was put at issue. Against that standard, we reviewed the record and the terms of the

parties' agreement, and determined that the evidence established that the College gave to the appellant all that he was promised in his employment contract-a certain procedure for making and appealing reappointment decisions, which did not contemplate a court's review on the merits. We concluded that the contract itself prohibited judicial review of the findings the College made when it decided not to reappoint him, and thus we lacked "jurisdiction," in a nontechnical sense, to review the merits of the College's decision. *Baker*, 532 A.2d at 403. In no way did we state or suggest that we had even contemplated restricting our review in reaching our decision. Thus, there is no precedent for restricting review in the present case, as the law currently stands in Pennsylvania.[7]

It remains, however, to determine whether a change in the law is in order. We consider, therefore, the propriety of the restricted standards the Superior Court embraced. When the Superior Court determined that it would limit its review to whether the University's protocol "comport[ed] with due process," *Murphy*, 745 A.2d at 1234, n. 2, its standard reflected the rule against which the actions of public entities are measured. Upon careful reflection, we can discern no principled basis for reviewing a breach of contract action that involves private conduct according to principles that arise out of the Fourteenth Amendment, and which govern state action.[8]

7.  In addition to *Baker*, the Superior Court majority cited several other cases to support its decision to restrict review. They too are inapposite. In *Schulman v. Franklin and Marshall College*, 371 Pa.Super. 345, 538 A.2d 49 (1988), and *Psi Upsilon v. University of Pennsylvania*, 404 Pa.Super. 604, 591 A.2d 755 (1991), the courts determined that they had been provided with no legal basis upon which to enjoin a school's decision to impose sanctions on students for on-campus misbehavior. In *Sola v. Lafayette College*, 804 F.2d 40 (3d Cir.1986), the court refused to allow a teacher who had been denied tenure to challenge a tenure quota as violative of public policy under a wrongful discharge theory.

8.  Throughout, the parties have treated this action as involving allegations that a private employment contract was breached. Except for an allegation in his Response to the University's Motion for Summary Judgment that the University committed a procedural breach of contract by violating the rules and regulations of the ABA that mirror principles of "double jeopardy," (which he has abandoned), Murphy has not alleged that he was entitled to due process under the Pennsylvania or the United States Constitution. Nor has he argued by analogy

Alternatively, when the Superior Court agreed with the trial court's conclusion that the "substantial evidence" of record supported the University's decision to terminate Murphy, its review reflected the standard that is applied under statute to administrative agency action. *See* 2 Pa.C.S. § 704. Likewise, we can discern no basis for this conceptual leap.

■ From our perspective, this is a breach of contract case between private parties, in which the issues raised are no different from those the Pennsylvania judiciary has typically adjudicated when presented with allegations of a contract's breach. Although one of the parties to this dispute is an institution of higher learning, we see no need or reason to devise special rules for restricting review. This is so because private parties, including religious or educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law. This is what was done by Lafayette College in *Baker* and, allegedly, by the University in this case. When a contract so specifies, generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review.

■ We, therefore, agree with Murphy on the threshold issue and hold that the governing standard of review is that which the Pennsylvania courts have traditionally applied in

that the University's procedures must be evaluated for fundamental fairness. *See Boehm v. University of Pennsylvania*, 392 Pa.Super. 502, 573 A.2d 575, 580–81 (1990) (noting that some courts have permitted inquiry into whether proceedings to discipline students established by a private academic institution incorporated basic notions of due process and fundamental fairness).

In light of the Superior Court's ruling on the standard of review, in the present appeal, Murphy argues that the Superior Court impermissibly transformed the Contract's procedure for tenure termination into an agreement for binding arbitration, and then challenges it as violative of constitutional due process in failing to provide for an impartial decision-maker. Because we reject the Superior Court's ruling, and accept Murphy's assertion that he is entitled to traditional judicial review, we need not address that challenge.

determining whether summary judgment was properly granted in a breach of contract case.

Our review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *Capek v. Devito,* 767 A.2d 1047, 1048, n. 1 (Pa. 2001). As with all questions of law, our review is plenary. *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof . . . establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT,* 560 Pa. 373, 744 A.2d 1276, 1277 (2000). Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre,* 532 Pa. 142, 615 A.2d 303, 304 (1992).

In order to evaluate Murphy's contention that summary judgment in the University's favor is precluded by the existence of genuinely disputed, material facts as to whether the University breached the Contract when it determined that Murphy had forfeited his tenure, we must determine the Contract's terms. The principles of law that control this determination are well-established.

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the

contracting parties. *Felte v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973). The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982). The whole instrument must be taken together in arriving at contractual intent. *Felte,* 302 A.2d at 351. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. *Steuart,* 444 A.2d at 662. " 'When a writing is clear and unequivocal, its meaning must be determined by its contents alone.' " *Felte,* 302 A.2d at 351 (quoting *East Crossroads Center Inc. v. Mellon Stuart Co.,* 416 Pa. 229, 205 A.2d 865, 866 (1965)).

Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. *Hutchison v. Sunbeam Coal Co.,* 513 Pa. 192, 519 A.2d 385, 390 (1986). A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* This question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Construc. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (Pa.1999). In the absence of an ambiguity, the plain meaning of the agreement will be enforced. *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.,* 512 Pa. 420, 517 A.2d 910, 913 (1986). The meaning of an unambiguous written instrument presents a question of law for resolution by the court. *Community College v. Community College, Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267, 1275 (1977).

The issue the parties have raised regarding the Contract's meaning may be stated as follows: Through what process was the question as to whether Murphy forfeited tenure due to serious misconduct to be finally decided-the one outlined in the Contract or the one available to litigants in a court of law? Neither Murphy nor the University argues that the Contract is in this regard ambiguous. Rather, they both assert that the

clear language of their agreement has only one reasonable meaning. Murphy contends that the Contract "merely state[d] that tenure could be forfeited for 'serious misconduct.' " It did not state expressly that "his tenure could be forfeited *if* it is determined via the process set forth in the [Statutes] that he has committed 'serious misconduct' or if the University President determines there are grounds for termination. ...." (Appellant's Brief at 15–16) (emphasis in original). According to Murphy, therefore, a jury in a civil action has the right to determine whether his behavior rose to the level of serious misconduct. The University counters that the Contract, "set[ ] forth precisely how this standard [was] to be evaluated and *by whom.* .... [The University] did not agree to turn over to a judge or jury the right to decide whether that standard [was] met. That right under the applicable contract remained with the chief executive officer of the University."* (Appellee's Brief at 23–24) (emphasis in original).

To persuade us of the merits of their respective positions, we note that both parties urge us to review tenure cases from other jurisdictions. Although these cases are somewhat informative, their value to our present analysis is limited. This is because no two systems of tenure are alike.[9] Through our research, we have discovered that the system of tenure contained in the Contract was unique, aimed at securing what the University deemed to be the best possible faculty to promote its mission and goals.

Thus, we set forth at length the Contract that controls in this particular case to provide the framework for resolving

---

**9.** As the Maryland Court of Special Appeals pointed out in *Johns Hopkins University v. Ritter,* 114 Md.App. 77, 689 A.2d 91 (1997), well over 90% of American colleges and universities, public and private, have a tenure system. *Id.* at 93. Most tenure systems are based in some measure on the 1940 Statement of Principles and Interpretive Comments developed by the Association of American Colleges and the American Association of University Professors. The 1940 Statement, however, was a statement of principles, "not a prescription of substantive institutional practice." *Id.* (quoting *Faculty Tenure,* a Report and Recommendations by the Commission on Academic Tenure in Higher Education, 2–3 (1973)). Thus, the tenure systems adopted respectively by the nation's schools are far from uniform. Indeed, on every aspect of tenure, policies and practices vary significantly. *Id.*

Murphy's claim that summary judgment in the University's favor was erroneous. The Contract's provisions regarding tenure emanated from Statute IV, and established a carefully controlled procedure consisting of several steps.

Under the Contract, upon the recommendation of designated officials, a teacher first joined the University's faculty through appointment by the President. Thereafter, a faculty member could advance in rank. Advancement in rank was not automatic; but rather, depended on performance. Only the University's President could confer advancement.

Following a period of appointments to the faculty, a full-time member was eligible for promotion to tenure based on designated criteria. The Contract stated:

Full-time members of the Faculty who have demonstrated excellence in teaching, scholarly and professional activities, and service to the University and who show promise of continued professional growth may be promoted to tenure. At least the following factors shall be considered in making the decision whether to award tenure: teaching performance; attainment of advanced degree; professional experience; participation in appropriate learned societies; evidence of significant scholarly research; University service; professional and community activities; and publication of articles or books held in high regard by other individuals in the faculty member's discipline, and contributions to the quality of campus life. The educational needs and priorities of the University and its financial circumstances shall also be important considerations in each tenure decision. . . . .

The Contract established a University Promotion and Tenure Committee that was responsible for reviewing candidates and recommending to the University's President those candidates whose promotion to tenure would serve the needs of the University and whose achievements clearly met University expectations. While the Contract required the President to consider relevant recommendations, it reposed the final decision to grant tenure exclusively in him. The Contract stated:

Tenure may be awarded only by the President and only in writing. .... In deciding whether to award tenure, the President shall consider, as appropriate, the recommendations of faculty member's department or School, University Promotion and Tenure Committee and Vice President for Academic Affairs.

The [University Promotion and Tenure] Committee is advisory to the President who possesses discretionary authority in making final decisions.

In Statute IV J., the Contract provided that "[t]enure entitles the faculty member to renewal of employment until retirement or age 70, whichever first occurs." The Contract also provided in Statute IV K.1., that tenure could be forfeited, and set out a process whereby forfeiture would occur. Grounds for forfeiture were serious misconduct or professional incompetence.[10] A faculty member whose tenure was the subject of a proposed termination could request a hearing before the Committee. The Contract stated:

A faculty member's tenure may be forfeited by serious misconduct or for professional incompetence. In the event of proposed termination for reasons of serious misconduct or for professional incompetency, tenured faculty shall be entitled to a hearing by a committee of the University Grievance Committee for Faculty. (see Statute VII, B.1.d.ii). The member shall be informed before the hearing by the President in writing of facts upon which such proposed termination is based and shall have the opportunity to present a defense. The member and the University may be represented at the hearing by counsel. There shall be a record made of the proceedings by electronic or other appropriate recording process and the same shall be made available to the parties. At the hearing, the testimony may include that of Faculty and other scholars, either from the University or from other institutions, and any other relevant testimony. The committee shall advise the faculty member and the University President of its decision in writing within

10. Statute IV K.2. set forth a process for "[t]ermination of a tenured appointment for reasons of final exigency."

30 days from the date of the termination of the hearing. If the committee's recommendation is that the faculty member should not be terminated and the President concurs, the case shall be closed. If the committee's recommendation is that the faculty member be terminated and the President disagrees with that recommendation, the case shall be closed. If the President terminates the affected faculty member either by approval of the committee's recommendation or by his/her own decision, following a committee recommendation of retention, the affected faculty member may have the final decision of the President reviewed by the Board of Directors.

Reprinting Statute V in its entirety, the Contract also provided that the University bore the burden of proving serious misconduct by clear and convincing evidence. Moreover, under the Contract, the Committee would make a recommendation to the President, but once again, the President had final decision-making power with regard to a tenured professor's termination due to serious misconduct. The Contract stated:

The burden of proof that adequate cause exists for the dismissal of a tenured faculty member rests with the institution and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

\* \* \*

Before a final decision is made by the President, he may meet with the Grievance Committee to discuss the merits of the Committee's findings and recommendations. No decision is to be made by the President at this meeting.

\* \* \*

The President makes his/her final decision and communicates it to the Grievance Committee, the Academic Vice President and to the parties involved in the dispute.

■ We turn now to the task of ascertaining the Contract's meaning according to the contract principles that guide

us. Having thoroughly reviewed the parties' agreement, we cannot accept Murphy's interpretation, which is based exclusively on the way one sentence in the Contract was written. Simply put, the parties' contractual intent cannot be gleaned by ignoring all but one sentence in the Contract, and then reading that sentence out of context. Moreover, contrary to Murphy's claim, specific, express written language is not necessary for a particular contractual intent to exist in an agreement. Rather, it is common for the intent of contracting parties to be inherent in the totality of their contract.

■■■ We accept, however, the University's position. We agree that the Contract was clear and unambiguous in setting out a process in Statute IV exclusively reserved to the University and its faculty for arriving at a conclusive determination as to whether Murphy's tenure had been forfeited for serious misconduct. Thus, while Murphy is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the Contract's terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination.

That this interpretation is correct is evident from a careful reading of the parties' entire Contract and the plain meaning of Statute IV K.1. when taken in context. Significantly, the source of the process of forfeiture of tenure under the Contract, like all decisions involving faculty employment, was the Statutes themselves. Thus, the Contract reflected that tenure forfeiture was considered a matter of the University's self-governance, and one that the parties had kept for themselves to determine.

The Statute in the Contract dedicated to the faculty, Statute IV, was comprehensive, covering the faculty's activities, benefits, rights, and responsibilities. Paragraph K.1. of Statute IV, which controlled tenure's forfeiture, was but one piece of a larger procedure that ultimately determined who would be part of the University's permanent faculty. Commencing with a teacher's appointment to the faculty, the Contract provided a means for the University to determine whether re-appoint-

ment, advancement, promotion to tenure, or if need be, termination should occur. At each step, the University evaluated a teacher against an applicable standard: had he performed in a manner that allowed for advancement; had he demonstrated the "excellence in teaching", the "scholarly and professional activities", the "service to the University" and the "promise of continued professional growth" that merited tenure; had he engaged in the "serious misconduct or professional incompetence" that warranted termination? The decisions made along the way, including the one for tenure forfeiture, were repeatedly described in the Contract as "final." Statute IV K.1. spoke in terms of a "closed" case.

All of these decisions involved subjective judgments of a teacher's professional and personal qualities, and his potential for either advancing or impeding the University's mission. They required an intimate understanding of the teacher, and of the University's philosophy, policies, and day to day life. The Contract, therefore, gave to the University's process, final authority to make them. The University is an ecumenically-based institution dedicated to promoting through the members of its tenured faculty the ethical and religious values of the "Judaeo–Christian tradition in its Catholic dimension." It comes as no surprise that the University and its faculty agreed not to cede to any lay outsider or secular institution the right to define and determine what behavior on the part of a faculty member was so antithetical to its mission that he could not remain a member of the University's community, and instead, concurred that the process set out in the Contract would finally decide whether a faculty member's actions rose to the level of serious misconduct and whether forfeiture was in order.

Moreover, there was nothing in the Contract to indicate that any of the judgments relating to a faculty member's continued place in the University, or lack thereof, would be open to a judge or jury to override. Indeed, it would be unreasonable to believe that the parties intended that the process for deciding the matter of tenure forfeiture, which was so carefully elaborated in their Contract to the point of final determination, could be completely circumvented by the filing of a civil

action. Rather, the detailed provisions of the Contract for deciding the matter have inherent in them the intent of the parties that the agreed-upon process was to be final. That intent, with respect to the finality of the process, is just as express and enforceable a promise as if it were actually written in the phrase that Murphy demanded.

We hold, therefore, that Murphy is not entitled to litigate the merits of his termination in this breach of contract action. That is to say, the questions as to whether he engaged in serious misconduct and whether his serious misconduct should have resulted in the forfeiture of tenure have been conclusively and finally decided.

We emphasize that the decision made about Murphy in this regard was not unrestrained. The Contract provided a judicial-like process and a standard for determining whether tenure forfeiture was warranted, and imposed upon the University an exacting burden of proof. Additionally, Murphy was entitled to, and in fact pursued, an appeal to the University's Board of Directors from the President's final decision. Moreover, Murphy was not subject to the President's whim. All of the participants in the process, including Murray, were required to follow the Contract's process to the letter, and fulfill their contractual obligations with good faith. We agree with the Superior Court's statement in *Baker* that "when an employer expressly provides in an employment contract for a comprehensive evaluation and review process, a court may look to the employer's good faith to determine whether the employer has in fact performed those contractual duties." *Baker*, 504 A.2d at 255.[11]

Now that we have determined the terms of the Contract, it remains to consider the facts that Murphy maintains are

11. We point out that this obligation of good faith is tied specifically to and is not separate from the duties a contract imposes on the parties. It is akin to the contract doctrine of necessary implication that has been described as follows:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from

material and genuinely disputed as to his claim of the Contract's breach. Murphy contends that a jury must resolve whether he engaged in the behavior that led to his termination and whether that behavior was serious misconduct. In light of our holding, we conclude that these questions are not material and not open to dispute and litigation in the present breach of contract claim.

Murphy also contends that a genuine issue of material fact exists as to whether the University breached a procedural term of the Contract by not having its Board of Directors consider additional evidence and argument when it reviewed the President's decision to reject the Committee's recommendation in favor of retaining him. This alleged contractual term was not contained in paragraph K.1 of Statute IV. According to Murphy, it was found in the 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings* ("Statement") of the American Association of University Professors ("AAUP"), as set forth in a letter the AAUP's Associate Secretary sent to him. Moreover, Murphy argues that contrary to the Superior Court's ruling, he is not collaterally estopped by the district court's decision from litigating this allegation.

First, we consider the doctrine of collateral estoppel. Collateral estoppel applies when the issue decided in the prior adjudication was identical with the one presented in the later action; there was a final judgment on the merits; the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior adjudication. *Capek,* 767 A.2d at 1051.

doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Slater v. Pearle Vision Center,* 376 Pa.Super. 580, 546 A.2d 676, 679 (1988) (quoting *Frickert v. Deiter Bros. Fuel Co. Inc.,* 464 Pa. 596, 347 A.2d 701 (1975)) (Pomeroy, J., concurring) (quoting *D.B. Van Campen Corp. v. Building and Const. Trades Council,* 202 Pa.Super. 118, 195 A.2d 134, 136 (1963)).

Having carefully reviewed the district court's entire opinion and its general statement that the process Murphy received was in accordance with contractual provisions and University policy and procedures, we are not persuaded that all of the elements of collateral estoppel are met. More specifically, it is not apparent that Murphy had a full and fair opportunity to litigate whether the 1958 AAUP Statement was part of the process that the University had to follow. Further, it is not apparent that in addressing Murphy's assertion that the University's proferred reason for his termination was a pretext for age discrimination, that the district court was required to determine whether Murphy's termination satisfied all of the Contract's procedural terms that allegedly came from tangential materials. Therefore, we conclude that Murphy's allegation of procedural breach arising out of the 1958 AAUP Statement is not subject to collateral estoppel.

Nonetheless, the issue offers Murphy no relief from summary judgment.[12] With regard to the AAUP, through the Faculty Handbook, the Contract incorporated the 1940 Statement of Principles of Academic Freedom, the 1970 interpretive comments, as well as the policies and procedures enunciated in the 1984 edition of the AAUP Policy Documents and Reports, as long as they did not conflict with the University's procedures. Nothing in the Contract explicitly mentioned or referred to or incorporated by reference the 1958 AAUP Statement. Thus, we find there to be no material, disputed facts of procedural breach that await resolution at trial.[13]

Accordingly, albeit for different reasons, we affirm the order of the Superior Court, affirming the order of the trial court granting summary judgment in the University's favor.

**12.** Although the record shows that Murphy raised this issue in the lower courts, it would appear that because he did not argue it clearly, neither the trial court not the Superior Court distinguished it from Murphy's allegation of procedural breach based on the AALS Standards and Bylaws. Inasmuch as our review is plenary and this question presents an issue of interpreting the Contract, we will address it, rather than remand, in the interests of judicial economy and efficiency.

**13.** As we have already noted, Murphy also asserted that AALS Bylaws or Standards precluded the University from punishing him twice for the same behavior. Even though the Superior Court concluded that collat-

Mr. Justice NIGRO and Madame Justice NEWMAN did not participate in the consideration or decision of this matter.

Mr. Justice ZAPPALA files a concurring opinion.

Justice ZAPPALA, Concurring.

I find that the resolution of the issues presented in this case is controlled by our decision in *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987), and would affirm the order of the Superior Court on that basis. ˙

eral estoppel applies to allegations of procedural breach, it resolved the allegation relating to the AALS on the merits. The court rejected Murphy's allegation, concluding that the Contract did not incorporate the AALS Bylaws or Standards or procedural requirements upon which Murphy relied. *Murphy,* 745 A.2d at 1235. It is not clear whether Murphy continues to pursue this particular assertion as a procedural breach, as it is mentioned only in passing in a footnote in his Brief. Assuming that he does, our review of the record reveals that the Superior Court's interpretation of the Contract is correct. We also point out that Murphy admitted in his deposition that the AALS Standards do not explicitly prohibit punishing a faculty member twice for the same misbehavior.