Scott ROBERTSON and Mara
Miller, H/W, Appellant

v.

DREXEL UNIVERSITY, Constantine
Papadakis, Stephen W. Director and
David E. Fenske, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 23, 2009.
Filed Feb. 22, 2010.

Armando A. Pandola, Jr., Philadelphia, for appellant.

Joe H. Tucker, Philadelphia, for appellee.

BEFORE: FREEDBERG, CLELAND and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 This is an appeal from an order entering summary judgment in favor of Appellees/defendants below in an action based on claims of contract breach [1] involving the denial of tenure to an associate professor at Drexel University. We affirm, concluding that the performance

1. The claim of fraudulent inducement contained in Appellant's Rule 1925(b) Concise Statement of Errors Complained of on Appeal has not been pursued in his appellate brief.

evaluation process which culminated in a finding that Appellant had failed to meet the standard required for an award of tenure did not constitute a breach of his employment contract.

¶ 2 In May of 2000, Appellant Scott Robertson was offered a position as an associate professor in the Drexel University College of Information Science and Technology. The offer document explained that prior to being considered for tenure, he was required by the University's Tenure Policy to serve a probationary period until the 2005–2006 academic year. At that point he would be considered for tenure. The offer further provided that,

> [i]t is understood that in accepting this appointment you agree to abide by University policies and procedures as described in the Faculty and Administrators' Handbook, and such other University policies as may be in effect from time to time. Since the University is a changing environment, University policies are subject to revision at any time . . .

(Letter from Richard Astro, Provost, 5/18/00, at 1). The next day, Appellant returned a signed copy of the letter indicating his acceptance.

¶ 3 The University's Faculty and Staff Manual, a supplement to the Handbook referred to in the letter, outlined tenure track[2] as a series of no more than seven years of full time employment with annual performance reviews, a "mid-term" review after the third year, and eligibility for tenure in the sixth year. At that point, consideration of a tenure application would be undertaken based on performance in the areas of teaching, scholarship, and service to the University. If tenure were denied, the seventh year would constitute the final year of employment with the University.

¶ 4 Appellant's annual reviews, *per* the Manual, rated his performance in the three areas of performance on an evaluation scale of outstanding, excellent, successful, needs improvement or unacceptable. In no area was the quality of his work assessed as needing improvement or unacceptable.

¶ 5 In June of 2005, following established protocol, Appellant initiated the tenure process by submitting all of the necessary materials. Appellee Dean Fenske, in a timely manner, then appointed a Tenure Committee for the 2005–2006 academic year who met on various occasions from June 30 to December 2, 2005; on December 15, 2005, the Committee reported its vote of 3 to 2 against tenure. The most significant aspects of the report were the votes in the area of research and scholarship. The report contained the explanation that "some committee members believed that [Appellant's] research and scholarship over his whole career should be considered," while "[o]thers thought that only his research at [Appellee University] should be considered" or given "much higher weight." (Report of Tenure Committee for Dr. Scott Robertson, 12/15/05, at 1, 8). Used in these evaluations was a five point scale measured against specified standards: (1) Does not meet criteria; (2) Marginally meets criteria; (3) Meets criteria; (4) Easily meets criteria; and (5) Exceeds criteria. The Committee's research and scholarship votes, 2–does not meet criteria; 1–marginally meets criteria; and 2–easily meets criteria, (*id.*), indicated an overall negative view of Appellant's performance in this area.[3]

---

2. The procedure applied to those appointments made before January 1, 2005.

3. The votes on teaching were "4 meets criteria, and 1 easily meets criteria." (Tenure Committee Report, 12/15/05, at 4). In the

¶ 6 The report was forwarded to Appellee/Dean Fenske, and following Appellant's response to the Report, Appellee Fenske recommended to Appellee/Provost Director that tenure be denied. After receiving Appellant's response to the recommendation, Appellee Director, too, decided against granting tenure, and discussions were held with Appellee/President Papadakis. Appellant was notified of the joint decision on March 22, 2006, and advised that the 2006–2007 would be his final academic year.

¶ 7 Following the policies and procedures necessary to challenge the denial of tenure, Appellant filed an appeal, and the Tenure Appeals Committee appointed to review it unanimously voted to sustain the appeal. The findings of the Committee were that the five point scale was "confused, misleading and arbitrary, and in contradiction to [sic] University policy and practice."[4] (Report of Tenure Appeals Committee, 3/2/07, at 1, 2). The Committee recommended that the question of Appellant's tenure should be reconsidered "by a newly constituted Review Committee, using a single standard based on consideration of the totality of his scholarly record, a voting procedure that produces a clear and unambiguous result." (*Id.* at 3).

¶ 8 Although Appellee Papadakis sustained the appeal, he accepted only some of the Committee's recommendations, keeping in place the five point scale, and returning Appellant's tenure file to the original committee to resume immediate reconsideration of his application using as a consistent standard his total scholarly record. Because one of the members of

the Committee had resigned from the University, deliberations resumed with four members. Appellee Director notified Appellee Fenske that he "had been advised that it was better not to add a fifth member to the original review Committee even if it means we have a split decision," so as "to avoid additional opportunities for appeal."[5] (Stipulated Facts 84, 85).

¶ 9 The Committee reassessed the research and scholarship and service areas, but retained the original recommendation that Appellant had met the teaching criteria. It also concluded that Appellant had met the service criteria. However, the resulting split vote on research and scholarship, 2 marginally meets criteria and 2 easily meets criteria, was reflected in the tenure vote: 2 in favor, 2 against.

¶ 10 After further consideration by Appellees and Appellant's further appeal, Appellant was terminated from the University as of August 31, 2007. The instant action was commenced in August of 2007, and cross motions for summary judgment, filed in July of 2008, were resolved in September. This appeal followed raising claims that in several respects the trial court erred in granting Appellees' motion for summary judgment.

¶ 11 The standard of our review on an appeal from the grant of a summary judgment motion is that

[a] reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

---

area of service to the University, the votes were "1 does not meet, 2 meets, and 2 easily meets [criteria]." (*Id.* at 10).

4. The five point scale has since been abandoned in favor of a yes/no vote. (Report of Tenure Appeals Committee at 2).

5. Plans to include as a fifth member a person who had been appointed to the Tenure Committee as a replacement for the original fifth member were not carried out.

In evaluating a trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof .... establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ.*, 565 Pa. 571, 777 A.2d 418, 429 (2001) (citations and internal quotation marks omitted).

¶ 12 In order to evaluate whether Appellant is correct in asserting that "summary judgment in the University's favor is precluded by the existence of genuinely disputed, material facts as to whether the University breached [its] contract" when it denied Appellant tenure, we must ascertain the terms of the contract, applying well established principles of contract law *Id.*

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that

contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Id.* (citations and internal quotation marks omitted).

¶ 13 The contract here is multi-partite and consists of the appointment letter, the University's Handbook addendum to the Faculty and Staff Manual, and the University's Academic Policies and Procedures addressing tenure, promotion, and tenure appeals. Appellant's claims of breach relate specifically to the number of persons on the reconstituted Tenure Review Committee, and the scale used for the evaluation of his performance. The decisions on these matters implemented by Appellees, it is contended, constitute procedural irregularities such as to provide grounds for Appellant's insistence that the University violated the contractual duties owed to him, the accuracy of which claim is attested to by the Stipulated Facts.

¶ 14 As to the first of these, the University's Tenure and Promotion Policy provides in pertinent part that:

[t]he Committee shall consist of tenured faculty members (i.e., all tenured faculty when there are fewer than six, and five members, appointed by the Dean, when there are more than five faculty members). The Dean shall appoint the committee in a timely fashion, and in no case later that the first week of the fall term.

(Faculty and Staff Manual at ¶ 4(a)). Appellant contends that this policy was violated when, after his appeal had been sustained unanimously by the Appeals Committee, authority for reconsideration was vested in the original panel minus one.

■ ¶ 15 However, the recommendation of the Appeals Committee was not binding but advisory only, as is made clear by the University's Academic Policies and Procedures:

> The President shall consider the recommendation of the Appeals Committee and the record as a whole, and **may take any action that s/he deems appropriate,** including, but not limited to, accepting the recommendation, rejecting the recommendation, investigating the matter, or returning the matter to the Appeals Committee for further consideration.

(Academic Policies and Procedures ¶ V(1) (emphasis added)). The same Policies and Procedures also mandate that "[t]he decision of the University President constitutes the last step of the appeal process and is final within the University community." (*Id.*). Appellee Papadakis' decision to reconstitute the existing Tenure Committee with less than the original number of members was accordingly within his prerogatives as president of the University, and not a breach of the University's contract with Appellant.

■ ¶ 16 The same can be said for the evaluation scale used by the Tenure Committee which Appellant argues was "a violation of University policy," (Appellant's Brief at 31), essentially because the Appeals Committee said so.[6] There are, however, two statements of policy germane to Appellant's assertion. First, Academic Policies and Procedures state unequivocally: "[t]he Appeals Committee shall not set **or question** University, College/School or Departmental policies or procedures, nor evaluate the decisions made by the various committees considering the case for tenure." (*Id.* at ¶ IV.A.(5) (emphasis added)). Moreover, as already noted, the Appeals Committee may only recommend a course of action, and the decision of the University President to follow it or not is unassailable.

¶ 17 Appellant also points to Appellee's "quip" that "good is not good enough" as a violation of the contract principle that "good means good and is good enough," (Appellant's Brief at 31), and as an example of his understanding that the evaluation scale, particularly the "meets criteria" denomination, violates his contract rights. In the context of tenure, however, the Academic Polices on Tenure and Promotion indicate otherwise:

> The decision between tenure and a terminal contract is based on the estimated probability that the person being considered is or will become an **outstanding** faculty member. This judgment is made with full consideration of his/her teaching, scholarship and service to Drexel. If the estimated probability is high, tenure should be recommended; otherwise a terminal contract should be recommended.

(*Id.* at 2 (unpaginated) (emphasis added)).

¶ 18 Appellant's contention that he met "the demanding criteria established by Drexel for obtaining tenure," (Appellant's Brief at 31), is not reflected in the votes of either the original or the second Tenure Committee. As Appellee Fenske noted to Appellee Director, "I ultimately agreed with the Committee recommending that tenure not be granted . . . . based on the lack of excellence in any category or based on a pattern of excellence unsubstantiated, in part, by individual votes within the various categories." (Letter of David Fenske, Dean, College of Information Science and Technology, 4/4/07, at 1). Appellee Fenske also pointed out that "[t]he five

---

**6.** We note that in his initial response of 1/6/06 to the denial of tenure by the original Tenure Committee Appellant made no mention of the evaluation scale.

point scale used by the Committee in the Robertson case is the same one used by the Committee in most of the previous years." (*Id.*). Finally, the Faculty and Staff Manual, in the Introduction to Criteria for Appointment, Tenure, and Promotion of Tenure Track Faculty, explains that in the areas critical to advancement, "[i]t is understood that no one candidate for a appointment or promotion will normally excel on all these criteria. However, it is expected that the candidate will qualify in all of these categories and will demonstrate excellence in at least one of the areas, in particular the areas of teaching and research." (*Id.* at (a)(2)(a)). Appellant would have us conclude that the original assessment of his performance in teaching, maintained intact after the appeal, 4 meets criteria, and 1 easily meets criteria demonstrates that having met the standards "must mean that an applicant does outstanding work." (Appellant's Brief at 32). We may not interpret these assessments.

¶ 19 In this same regard we must address Appellant's assertion that "[t]he only issue before this Court is whether the contract between the parties was breached based on the stipulated facts and the documents that are attached to those stipulated facts. The Court is not being asked to determine whether [Appellant] deserved to have Tenure, nor is it being asked to make a decision about [his] qualifications for tenure." (Appellant's Brief at 7). However, Appellant's invitation that we interpret the meaning of the votes on the evaluation scale make clear that such a determination is precisely the action desired, and we decline to proceed in that arena.

¶ 20 Further, all of Appellant's assignments of error turn on decisions made by Appellee Papadakis within his prerogatives as the President of the University on the basis of recommendations received from the other Appellees or the Appeals Committee. As the trial court, citing *Murphy, supra,* points out, "private parties, including religious and educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law." *See Id.* at 428–29. That is the determinant factor in this instance.

■ ¶ 21 While Appellant couches his complaint in terms of contract breach, nothing that he has advanced convinces us that he was denied execution of the tenure process promised in his appointment letter and contained in the documents which supplement it. As the *Murphy* Court explains, albeit in a slightly different context,

> [a]ll of these [challenged] decisions involved subjective judgments of a teacher's professional and personal qualities, and his potential for either advancing or impeding the university's mission. They required an intimate understanding of the teacher, and of the University's philosophy, policies and day to day life. The Contract, therefore, gave to the University's process, final authority to make them.

*Id.* at 433. That is the case here, and, as in the situation there, we decline to intervene where Appellant has failed to demonstrate any action by Appellees inconsistent with the terms of his contract.

¶ 22 Appellant's final two claims concern first, the consideration of his tenure application after the appeal by a reconvened original Committee without the addition of a fifth member who had not sat on the initial Committee but had been appointed as a replacement. He also asserts a violation of the policy requiring an individual assessment of his application by each Appellee. Neither merits relief. The first of

these is covered by the same policies as apply to the evaluation scale, and the second by a review of each Appellee's findings. Appellant's insistence that the Appellees in some way rubber stamped each other's conclusions is simply not borne out by the record. As the trial court observes, each Appellee twice made independent recommendations against tenure and concluded that Appellant's application did not warrant presentation to the Board of Trustees. (*See* Trial Ct. Op. at 20). In so doing, each acted within his prerogatives and the parameters set by the contract.

¶ 23 Order affirmed.