J. A25032/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

RAYMOND M. DONADIO, JR. AS : IN THE SUPERIOR COURT OF
PERSONAL REPRESENTATIVE OF THE : PENNSYLVANIA
ESTATE OF ELIZABETH C. PALMER, :
:
v. :
:
FONNER INSURANCE ASSOCIATES, INC., :
:
Appellant :
: No. 234 EDA 2015

Appeal from the Order December 9, 2014
In the Court of Common Pleas of Montgomery County
Civil Division No(s).: 2014-05370

BEFORE: DONOHUE, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED December 17, 2015**

Appellant, Fonner Insurance Associates, Inc. ("Fonner"), appeals from

the order denying its motion for judgment on the pleadings and granting the

cross-motion for judgment on the pleadings filed by Appellees, Raymond M.

Donadio, Jr., as personal representative of the Estate of Elizabeth C. Palmer

("Estate"). Fonner contends the underlying contract is illegal and,

alternatively, should have been construed in its favor. Fonner also

challenges the award of attorneys' fees and costs to the Estate. We affirm.

We adopt the facts as set forth in the amended complaint.[1] Britton W.

Palmer, Jr., also known as "Britt," owned an insurance brokerage firm

---

[*] Former Justice specially assigned to the Superior Court.

named Britton W. Palmer & Sons, Inc., and was married to Elizabeth C. Palmer. On November 1, 2006, Britton and Elizabeth executed an agreement to sell the brokerage firm to Fonner.

The purpose of the agreement follows:

BACKGROUND

Britt is an independent contractor engaged in the business of selling insurance ("Business"). Britt wishes to sell and Buyer [*i.e.*, Fonner,] wishes to buy certain insurance assets, as more specifically hereinafter described. The parties agree to the foregoing under and subject to the following terms and conditions.

NOW THEREFORE, the parties hereto, intending to be legally bound, agree as follows:

1. On the Closing Date (as hereinafter defined), Palmer[2] shall sell, convey, transfer and assign to Buyer, and Buyer shall purchase from Palmer for the consideration set forth in Section 3 below the following (the "Assets"):

a. all of Palmer's goodwill, customer lists, prospect lists, accounts and related files existing as of the Closing Date, including, without limitation, the items listed on Schedule 1a (the "Accounts").[3]

---

[1] "On appeal, we accept as true all well-pleaded allegations in the complaint." **Consolidation Coal Co. v. White**, 875 A.2d 318, 325-26 (Pa. Super. 2005) (citation omitted).

[2] The agreement defined "Palmer" as Britt, Elizabeth, and Britton W. Palmer & Sons, Inc.

[3] Schedule 1a was not part of the record but is not necessary to our disposition.

      b. all of Palmer's right to and interest in telephone numbers and uniform resource locators used in connection with operating Palmer's Business.

R.R. at 13a.[4]

Section 3 governed the purchase price:

      3. In consideration of the transferred Assets, Buyer shall pay to Britt or Britt's Successor-in-Interest (as defined below), as applicable, (i) forty-five percent (45%) of all Retained Commissions, (ii) ten percent (10%) of Broker Business Commissions and (iii) Britt's Pro Rata Share of Volume Profit Sharing (each as defined below, the Retained Commissions, Broker Business Commissions and the Volume Profit Sharing, collectively, the "Earnout Base" and the amount to be paid to Britt or Britt's Successor-in-Interest, the "Earnout Payments") within fifteen (15) days of the end of the month during which such Earnout Base is actually received by Buyer. . . . Palmer shall use Palmer's best efforts to obtain payment of the Earnout Base due on account of the Assets from any customer or any insurance underwriter providing coverage to Palmer's customers. Under no circumstances shall Buyer be obligated to pay Britt or his Successor-in-interest any Earnout Payment on account of Earnout Base not actually collected by Buyer. In the event any commissions are refunded or returned by Buyer to Buyer's customers or any insurance underwriter for any reason, Britt or Britt's Successor-in-Interest shall return to Buyer the entire Earnout Payment paid to Britt or his Successor-in-Interest, as applicable, in respect of such refunded or returned commissions and this obligation shall survive termination of the Agreement. . . . "Retained Commissions" shall mean net commissions actually paid to, and received by Buyer directly arising from the Accounts;[5] "Broker Business Commissions" shall mean gross commissions, prior to payment of any broker

---

[4] We cite to the reproduced record for convenience.

[5] "Accounts" is defined as including, *inter alia*, the customer accounts of Britton W. Palmer & Sons, Inc.

> commission-sharing obligations, directly arising from business placed through Haas[6] by an independent third-party broker, "Volume Profit Sharing" shall mean additional bonuses received from insurance underwriters for success in achieving certain levels of business and "Britt's Pro Rata Share" shall be equal to a fraction, the numerator of which is the amount of business sourced by Britt to such underwriter and the denominator of which is the total amount of business sourced to such underwriter by Britt and Buyer collectively, all calculated over such period of time as is used to calculate the Volume Profit Sharing. The Earnout Base shall only include amounts received from the date of closing until the tenth (10th) anniversary of closing. In the event of Britt's death after the closing, Buyer shall continue to make Earnout Payments to Britt's Successor-in-Interest as set forth in this Agreement. Upon Britt's death, "Successor-in-Interest" shall mean (i) if Britt is survived by his current spouse Elizabeth C. Palmer, then Elizabeth C. Palmer or (ii) if Elizabeth C. Palmer has died, then Britt's estate.

R.R. at 14a. The Agreement included an integration clause. Britt passed away on December 20, 2011, and Elizabeth passed away on September 8, 2013.

Appellees filed suit on March 12, 2014, raising claims for declaratory judgment and breach of contract. Eventually, each party filed a motion for judgment on the pleadings. On December 10, 2014, the court denied Fonner's motion for judgment on the pleadings and granted Appellees' cross-

---

[6] "Haas" is a third party that Palmer gave a right of first refusal to purchase the Accounts.

- 4 -

motion for judgment on the pleadings. Fonner timely appealed and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.[7]

Fonner raises the following issues:

1. Whether the Trial Court erred by determining Fonner is obligated to make payments to the Estate as contemplated in an agreement pursuant to which Fonner was to pay a certain percentage of commissions related to the acquisition of clients of Britton W. Palmer & Sons, Inc. dated November 1, 2006 ("Agreement") for the balance of the 10 year term, since that determination would require both Fonner (payor) and the Estate (payee) to violate the law.

2. Whether the Trial Court erred by failing to determine, consider or properly apply the fact that Fonner is not contractually obligated to make monthly payments to the Estate arising out of the Agreement in light of the unambiguous expression of the parties' intention that the death of Elizabeth C. Palmer, with her husband Britton W. Palmer, Jr. having predeceased her, terminates the payment obligations.

3. Whether the Trial Court erred by failing to determine, consider or properly apply the fact that the language of the Agreement itself and the law of this Commonwealth regarding contract interpretation expressly provides that the right to the Earnout Payments (as defined in the Agreement) did not pass to the Estate of Elizabeth C. Palmer following her death, with her husband Britton W. Palmer, Jr. having predeceased her.

4. Alternatively, whether the Trial Court erred by failing to determine the Agreement is ambiguous as to whether Fonner is contractually obligated to make monthly

---

[7] Appellees timely cross-appealed and timely filed a court-ordered Rule 1925(b) statement. Appellees discontinued the cross-appeal on May 18, 2015.

payments to the Estate following her death, with her husband Britton W. Palmer, Jr. having predeceased her.

5. Whether the Trial Court erred when it determined the Estate is a prevailing party entitled to an award of the payment of its attorneys' fees and costs by Fonner.

Fonner's Brief at 4-5.

In support of its first issue, Fonner contends the Agreement violates 40 Pa.C.S. §§ 310.72 and 310.73, which govern the payment and receipt of insurance commissions. Fonner thus claims the contract is illegal and void. Alternatively, Fonner argues it is a licensee and the law bars payments of insurance commissions to a non-licensee, such as the Estate. Appellees counter that Fonner waived the issue of whether the Agreement was illegal by not raising it as an affirmative defense in its answer and new matter. Fonner, however, replies that it raised the illegality defense for the first time in its response to Appellees' cross-motion for judgment on the pleadings. We hold Fonner is not entitled to relief.

As a prefatory matter, we address whether Fonner waived its defense of illegality. Pennsylvania Rule of Civil Procedure 1030(a) governs mandatory invocation of affirmative defenses:

(a) Except as provided by subdivision (b), all affirmative defenses including but not limited to . . . illegality . . . shall be pleaded in a responsive pleading under the heading "New Matter". A party may set forth as new matter any other material facts which are not merely denials of the averments of the preceding pleading.

- 6 -

Pa.R.C.P. 1030(a).[8] Rule 1032(a) provides that a party waives all defenses not raised in an answer: "A party waives all defenses and objections which are not presented either by preliminary objection, answer or reply . . . ." Pa.R.C.P. 1032(a).

Notwithstanding Rule 1032(a), however, it has been long settled that the defense of illegality is not waived if a party failed to invoke it. In **Howarth v. Gilman**, 65 A.2d 691 (Pa. Super. 1949), this Court addressed the issue as follows:

> Appellants' basic contention is that the contracts were illegal because appellees were engaged in the practice of the profession of engineering without a license contrary to the Act of May 23, 1945, P.L. 913, 63 P.S. § 148 et seq., and appellees were thereby barred from recovery. Preliminarily, we shall dispose of appellees' contention that the defense of illegality was not raised by appellants' pleadings and was not interposed in time. That appellees were not licensed pursuant to the Act of 1945, supra, and that John A. Howarth represented himself as being engaged in the 'business of industrial designing and engineering,' appeared in appellees' case, not only by admitted pleadings, which were read into the record, but also on cross-examination of the appellee. On such state of the record it has been held that such illegality was properly cognizable by the court although such defense had not been previously raised. **Brenner v. Pecarsky**, 86 Pa. Super. 414, 416. **Cf. F. F. Bollinger Co. v. Widmann Brewing Corp.**, 339 Pa. 289, 14 A.2d 81; **Hazle Drug Co., Inc., v. Wilner**, 284 Pa. 361, 368, 131 A. 286.

---

[8] The rule is substantially identical to the version originally enacted in 1946.

*Id.* at 692; ***accord Norristown Ford Co. v. Metro. Auto Dealer, Inc.***, 132 A.2d 725, 726 (Pa. Super. 1957);[9] ***see also Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.***, 588 A.2d 491, 496 (Pa. 1991) (holding, "The illegality of a contract is therefore a question not entirely controlled by the rules of pleading; ***whenever*** it appears that the enforcement of a contract would violate public policy, the court should dismiss the proceedings of its own motion.").

The instant facts are akin to the facts in ***Howarth***. Although Fonner— like the appellants in ***Howarth***—failed to invoke the affirmative defense of illegality properly, it has not waived the defense given its underlying contention that the Agreement violates two Pennsylvania statutes. ***See***

---

[9] One treatise stated the following:

> Also, although the illegality of a contract is an affirmative defense that must be pleaded, the defense is not waived by the defendant's failure to plead it. The illegality of a contract is a question not entirely controlled by the rules of pleadings because the courts will not be used to enforce contracts that violate public policy. A plaintiff cannot be permitted recovery on an illegal cause of action, even if the defendant failed to properly plead illegality; thus, the defense of illegality is properly cognizable by the court where the illegality appears from the plaintiff's pleadings or on cross-examination of the plaintiff. Moreover, whenever it appears that the enforcement of a contract would violate public policy, the court should dismiss the proceedings on its own motion, even if the issue is raised clearly for first time in post-trial motions.

5 Standard Pennsylvania Practice 2d § 27:30 (footnotes omitted).

***Howarth***, 65 A.2d at 692; ***see also Meat Processors***, 588 A.2d at 496.

Accordingly, we proceed to examine the merits.

Our standard of review follows:

> Entry of judgment on the pleadings is permitted under Pennsylvania Rule of Civil Procedure 1034, which provides that after the pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for judgment on the pleadings. A motion for judgment on the pleadings is similar to a demurrer. It may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. In determining if there is a dispute as to facts, the court must confine its consideration to the pleadings and relevant documents. On appeal, we accept as true all well-pleaded allegations in the complaint.

> On appeal, our task is to determine whether the trial court's ruling was based on a clear error of law or whether there were facts disclosed by the pleadings which should properly be tried before a jury or by a judge sitting without a jury.

>> Neither party can be deemed to have admitted either conclusions of law or unjustified inferences. Moreover, in conducting its inquiry, the court should confine itself to the pleadings themselves and any documents or exhibits properly attached to them. It may not consider inadmissible evidence in determining a motion for judgment on the pleadings. Only when the moving party's case is clear and free from doubt such that a trial would prove fruitless will an appellate court affirm a motion for judgment on the pleadings.

***White***, 875 A.2d at 325 (internal quotation marks and citations omitted).

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the

writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429-30 (Pa. 2001) (internal quotation marks and citations omitted). "[I]t is not the function of this Court to re-write it, or to give it a construction in conflict with that which accords with the accepted and plain meaning of the language used." *Hagarty v. William Akers, Jr. Co.*, 20 A.2d 317, 319 (Pa. 1941); *accord Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 250-51 (Pa. Super. 2013).

Because two statutes are involved, we set forth the following guidelines:

Because statutory interpretation is a question of law, our standard of review is *de novo*, and our scope of review is plenary.

> The object of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. ***See*** 1 Pa.C.S. § 1921(a). When the words of a statute are clear and free from all ambiguity, their plain language is generally the best indication of legislative intent. A reviewing court should resort to other considerations to determine legislative intent only when the words of the statute are not explicit. 1 Pa.C.S. § 1921(b). In ascertaining legislative intent, this Court is guided by, among other things, the primary purpose of the statute, ***see*** 1 Pa.C.S. § 1921(c)(4), and the consequences of a particular interpretation. ***Id.*** § 1921(c)(6).
>
> Moreover, it is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute.

***Braun v. Wal-Mart Stores, Inc.***, 24 A.3d 875, 953 (Pa. Super. 2011) (*per curiam*) (internal quotation marks, brackets, and some citations omitted).

Section 310.72 of Title 40 sets forth limitations on the payment of commissions:

> **(a) Limitation.—**An insurance entity may pay a commission, brokerage fee, service fee or other compensation to a licensee for selling, soliciting or negotiating a contract of insurance. A licensee may pay a commission, brokerage fee, service fee or other compensation to a licensee for selling, soliciting or negotiating a contract of insurance. Except as provided in subsection (b),[10] an insurance entity or licensee may **not** pay a commission, brokerage fee, service fee or other compensation to a person that is not a licensee **for activities related to the sale, solicitation or negotiation of a contract of insurance**.

---

[10] None of the exceptions set forth at subsection (b) apply.

40 P.S. § 310.72 (emphases added). Simply, an insurance agency cannot compensate a non-licensee for anything related to the sale of an insurance contract. *See id.*

Section 310.73 governs limitations on the receipt of commissions:

> **(a) Limitation.—**A licensee may accept a commission, brokerage fee, service fee or other compensation from an insurance entity or licensee for selling, soliciting or negotiating a contract of insurance. Except as provided in subsection (b), a person may **not** accept a commission, brokerage fee, service fee or other compensation from an insurance entity or licensee if the person is not a licensee and the compensation is **for activities related to the sale, solicitation or negotiation of a contract of insurance**.

40 P.S. § 310.73 (emphases added). Similar to Section 310.72, a non-licensee is not allowed to be compensated for anything related to the sale of an insurance contract. *See id.*

Section 310.1 defines "sell" and "negotiate" as follows:

> The following words and phrases when used in this article[11] shall have the meanings given to them in this section unless the context clearly indicates otherwise:
>
> \* \* \*
>
> **"Negotiate."** To confer directly with or to offer advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning the substantive benefits, terms or conditions of the contract, provided that

---

[11] This is a reference to Article VI-a, which encompasses 42 P.S. §§ 310.72 to .73.

the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers.

\* \* \*

**"Sell."** To exchange a contract of insurance by any means for money or its equivalent on behalf of an insurance entity.

40 P.S. § 310.1.

Instantly, the Agreement governs the sale of a business, specifically, Palmer's Assets, including goodwill and accounts. **See** R.R. at 13a. Nothing in the Agreement suggests it was for the sale, solicitation, or negotiation of an insurance contract, and we will not strain the language of the Agreement beyond its well-settled meaning. **See id.**; **Hagarty**, 20 A.2d at 319. Fonner identified no language in the Agreement suggesting its purpose was anything other than an asset purchase. **See Murphy**, 777 A.2d at 429-30.

The plain language of Sections 310.72 and 310.73 limit the payment and receipt of compensation associated with the "sale, solicitation, or negotiation of a contract of insurance." **See** 40 P.S. §§ 310.72, 310.73; **see also** 40 P.S. § 310.1 (defining "negotiate" and "sell" in reference to contracts of insurance).[12] We discern no ambiguity in this phrase. **See Braun**, 24 A.3d at 953. We perceive no construction of this phrase that would encompass the purchase or sale of a business. **See id.** Because Sections 310.72 and 310.73 limit payments related to the sale, solicitation,

---

[12] We acknowledge the redundant nature of the definitions.

or negotiation of an insurance contract only, and because the instant Agreement does not involve the sale, solicitation, or negotiation of an insurance contract, Sections 310.72 and 310.73 do not apply. **_See id._**; **_Murphy_**, 777 A.2d at 429-30. Because Sections 310.72 and 310.73 do not apply, we reject Fonner's contention that the Agreement violates the law.

We summarize Fonner's arguments in support of its second, third, and fourth issues. As noted above, the relevant Agreement provision follows:

> In the event of Britt's death after the closing, Buyer shall continue to make Earnout Payments to Britt's Successor-in-Interest as set forth in this Agreement. Upon Britt's death, "Successor-in-Interest" shall mean (i) if Britt is survived by his current spouse Elizabeth C. Palmer, then Elizabeth C. Palmer or (ii) if Elizabeth C. Palmer has died, then Britt's estate.

R.R. at 14a. Fonner contends that the Agreement allowed for payments to Britton's estate, but was silent regarding payments to Elizabeth's estate. When an Agreement is silent, Fonner argues, the court cannot impute Elizabeth's estate into the contract term "Elizabeth." By engaging in such imputation, Fonner argues, the court rendered the phrase "Britt's estate" superfluous. In Fonner's view, the Agreement unambiguously provides that when Elizabeth died, it could stop paying. Alternatively, Fonner counters that the Agreement is ambiguous given the parties' differing interpretations of this clause. Fonner opines the court should have denied both parties' motions for judgment on the pleadings and let the case proceed to trial. In

essence, Fonner is arguing that because the sellers are now deceased, it can stop paying for the Assets it bought. Fonner, we hold, is due no relief.

By way of background,

> The death or disability of a party to a contract of a continuing character or to be performed at a future time may terminate the contract or excuse nonperformance only if the contract depends on the personal qualities or abilities of such party.

> \* \* \*

> On the other hand, an agreement not necessarily required to be performed in person or not involving peculiar skills authorizes the inference that a mere personal relation was not contemplated, and such a contract is not discharged by death, although the rule is subject in the first instance to a construction of the contract itself and the determination from its terms as to what was the intention of the parties.

> \* \* \*

> Of course, the parties to a contract may, by express terms, agree that the right of performance shall be discharged upon the death of one of the parties, and thus exclude substituted performance. It is also true that a contract may involve matters of such a nature as to render the performance of them so incompatible with the settlement of a decedent's estate, and so inconsistent with the general duties of an administrator or executor that, in the absence of any express provision to the contrary, the parties may be presumed to have intended its dissolution at death.

12 Pa. Law Encyclopedia 2d § 457 (2010) (footnotes omitted).

In *Young v. Gongaware*, 119 A. 271 (Pa. 1922), the decedent sold goods to the defendant for $2,300, specifically $300 in cash and the remainder in stock of a third party. *Id.* The defendant retained the right to

rescind the stock transfer within two years, and "after this period, [decedent] at any time could elect to take cash by demanding its redemption." **Id.** The decedent did not demand sale within his lifetime. **Id.**

Within one month of the decedent's death, which was almost four years after the two-year period expired, the decedent's widow—as administratrix—requested the defendant to sell the stock for cash, specifically $2,000 and interest. **Id.** The defendant refused, arguing "the right to demand fulfillment of the contract did not pass to plaintiff as administratrix of her husband's estate, that what was bargained for was the personal judgment of decedent as to what should be done with the stock." **Id.** at 272.

The **Young** Court rejected the defendant's argument:

> Where the contract may be performed by the personal representatives, or where it embodies a property right, the performance of such duty and the succession of such right to the personal representatives is generally held to be the rule of law; death does not terminate such contracts. The parties may, however, by express terms, agree that the right shall not pass, and so exclude substituted performances.
>
> *        *        *
>
> [I]t is clear, from a careful consideration of the contract before us, what is given is the right to select one of two alternative methods for the payment of a debt;[13] it was not a personal right in Young, but is a property right passing as an asset to his estate in which creditors and

---

[13] It is not entirely clear what the second method of payment was.

others have an interest. The duty enjoined, demanding payment in cash, was not incompatible with the general duties of an administrator, but was in harmony with them, aiding a prompt settlement of the estate. Performance required nothing more than the exercise of sound judgment, a thing constantly required of these officers when they sell or otherwise deal with the estate of a decedent. **Here we have a contract of sale, not fully performed as to payment of the purchase price. Plaintiff could not require a return of the goods sold defendant; what she demands is complicance** [sic] **with the terms of the agreement.** . . .

\* \* \*

[The contract] fixed a property right of value which could and did pass as part of his estate to the administratrix, who had all decedent's power under the agreement to enforce fulfillment of the obligation.

*Id.* (citations omitted).

Instantly, similar to the *Young* contract for goods, the instant Agreement to sell the brokerage firm did not require Britt or Elizabeth to perform purely personal services. *See id.*; 12 Pa. Law Encyclopedia 2d § 457. Given the contracts in the instant case and *Young* govern an asset sale, the instant right is a property right that can pass as an asset to an estate in which creditors may have an interest. *See Young*, 119 A. at 272. Akin to the *Young* contract, which was "not fully performed as to payment of the purchase price," the instant Agreement also has not yet been fully performed by Fonner. *See id.* Fonner, in other words, similar to the defendant in *Young*, has not yet finished paying for the brokerage firm. *See id.*

As with the widow in *Young*, the administrator of Elizabeth's estate has also demanded compliance with the Agreement. ***See id.*** The administrator, identical to the administratrix in *Young*, has Elizabeth's "power under the agreement to enforce fulfilment of the obligation." ***See id.*** Identical to the widow in *Young*, we hold Appellees are "merely collecting a debt arising under the contract's peculiar terms of payment." ***See id.*** We also discern nothing within the contract that expressly discharged Fonner's obligation to pay if Elizabeth died. ***See*** 12 Pa. Law Encyclopedia 2d § 457. Accordingly, we discern no error of law by the trial court. ***See Murphy***, 777 A.2d at 429-30.

For its last issue, Fonner contends the trial court erred by holding the Estate was entitled under the Agreement to attorneys' fees and costs as a prevailing party. For the reasons set forth above, a right to counsel fees and costs under the Agreement is a property right that can pass as an asset to the Estate. ***See Young***, 119 A. at 272. Accordingly, having discerned no error of law, we affirm. ***See White***, 875 A.2d at 325.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/17/2015