J-A25018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DR. THOMAS WINTER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | No. 745 MDA 2020 |
| UNIVERSITY | : | |

Appeal from the Order Entered March 20, 2020
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
8789 of 2016

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                **FILED DECEMBER 30, 2020**

Appellant, Dr. Thomas Winter, appeals from the March 20, 2020 order granting summary judgment in favor of The Pennsylvania State University ("Penn State").  We affirm.

The record demonstrates that, for 38 years, Penn State employed Appellant as a tenured professor of physics in the Eberly College of Science at Penn State's Wilkes-Barre Campus in Lehman, Pennsylvania, Luzerne County. Effective November 20, 2014, Penn State terminated Appellant from his employment for "grave misconduct" stemming from Appellant's alleged sexual harassment of an undergraduate student.

Appellant filed a complaint on August 23, 2016, and an amended complaint on October 4, 2016, against Penn State that raised a claim for breach of contract related to his alleged unlawful termination and Penn State's

alleged failure to act in good faith throughout the termination process. Penn State filed preliminary objections in the nature of a demurrer to Appellant's amended complaint, which the trial court overruled. Penn State subsequently filed an answer containing new matter to Appellant's amended complaint.

On July 18, 2019, Penn State filed a motion for summary judgment, arguing, "Penn State followed its policy and process for dismissal of tenured faculty members when it terminated [Appellant]" and "[u]nder Pennsylvania law, [Appellant] is not entitled to re-litigate the merits of that decision[.]" *See* Penn State's Motion for Summary Judgment, 7/18/19, at ¶ 70. On December 12, 2019, the trial court entertained argument on Penn State's motion for summary judgment. On March 20, 2020, the trial court, concluding that Penn State acted in good faith and complied with its stated policies and procedures for the dismissal of a tenured faculty member, entered an order granting summary judgment in favor of Penn State.[1] This appeal followed.

Appellant raises the following issue for our review:

> Did the trial court commit an error of law by granting [Penn State's] motion for summary judgment, where a genuine issue of material fact exists with respect to whether [Penn State] failed to conduct the termination process and contractually agreed upon procedures as set forth in [Penn State's] polices, [specifically] HR-70[] and [AD]-85, in good faith as required by Pennsylvania law?

Appellant's Brief at 4 (extraneous capitalization omitted).

---

[1] The trial court also filed an opinion on March 20, 2020.

Appellant's issue challenges the trial court's order granting summary judgment, for which our standard and scope of review are well-settled.

> A reviewing court may disturb the order of the trial court only where it is established that the [trial] court committed an error of law or abused its discretion.  As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule.  [*See*] Pa.R.C[iv].P. 1035.2.  [Rule 1035.2] states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered.  Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment.  Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.  Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (case citations, ellipses, and quotation marks omitted) (rejecting the "need or reason to devise special rules for restricting review" of a dispute involving an institution of higher learning in a breach of contract case).

In a cause of action alleging a breach of contract, the plaintiff must prove: "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. 2005) (citation omitted).  In evaluating whether a party is entitled to summary judgment, this Court must first determine the

terms of the contract, for which the principles of law that control this determination are well-settled.

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Murphy*, 777 A.2d at 429-430 (citations and quotation marks omitted).

Here, Appellant, in sum, argues that a genuine issue of material fact exists as to whether Penn State followed the policies and procedures outlined in "Penn State Human Resources Policy HR-70 Dismissal of Tenured or Tenure-Eligible Faculty Members" ("HR-70") in good faith when Penn State terminated Appellant's employment. Appellant's Brief at 12-24. Specifically, Appellant asserts that Penn State deviated from the procedures, as set forth in HR-70, when Kenneth Lehrman, Vice President for Affirmative Action and Title IX Coordinator, ("Lehrman") conducted what Appellant characterized as

an "ambush interview" after Lehrman received a complaint of sexual harassment involving Appellant and did not provide Appellant notice of the allegations prior to the meeting. *Id.* at 14-15. Appellant contends the trial court erred when it concluded that the "ambush interview" was not part of the formal termination proceedings, as set forth in HR-70, because the meeting was investigatory in nature. *Id.* at 16. Rather, Appellant argues that the meeting was the initial first step in the termination process, that the interview failed to comply with the requirements set forth in HR-70, and that Penn State, therefore, did not act in good faith when it deviated from the requirements set forth in HR-70. *Id.* at 17. Appellant also contends that Penn State did not act in good faith during Appellant's meeting with Marilyn L. Hanes, Vice President for Commonwealth Campuses and Dean of University College, ("Hanes") and Daniel J. Larson, Dean of the Eberly College of Science, ("Larson") subsequent to his "ambush interview" with Lehrman when Hanes and Larson failed to question Appellant about the "apparent conflict between" Lehrman's report pertaining to the sexual harassment allegations[2] and Appellant's written rebuttal of the allegations. *Id.* at 18. Appellant also asserts that a genuine issue of material fact exists as to whether Penn State acted in good faith in conducting the Standing Joint Committee on Tenure

_____

[2] On May 12, 2014, Lehrman wrote the Chancellor of Penn State's Wilkes-Barre Campus to report his conclusions after conducting an investigation into the sexual harassment allegations and to recommend that Penn State initiate dismissal proceedings against Appellant. *See* Penn State's Motion for Summary Judgment, 7/18/19, at "Doc. 8", pages 239-244.

("SJCT") termination hearings because the chairperson of the SJCT was "inadequately trained and [had] a conflict of interest with a witness." *Id.* at 19-22. Finally, Appellant submits that a genuine issue of material fact exists as to whether Penn State acted in good faith when the Office of the Provost, having "just received the SJCT's report [recommending Appellant's termination] the day before, already had a draft termination letter prepared to forward to [Eric J. Barron, President of Penn State, ("Barron")] for his 'review and signature'." *Id.* at 23.

Penn State asserts that the trial court correctly determined that the termination proceedings contemplated by HR-70 were not initiated by Lehrman's meeting with Appellant. Penn State's Brief at 15-17. Instead, Penn State argues that the May 22, 2014 letter from Hanes to Appellant initiated the termination proceedings pursuant to HR-70.[3] *Id.* Penn State contends,

> it is unreasonable to construe the process of investigating possible misconduct as constituting part of the HR[-]70 dismissal process. This is apparent from any reasoned interpretation of HR[-]70. Indeed, to suggest otherwise would mean that the provisions of HR[-]70 apply even when an investigation results in no finding of misconduct sufficient to warrant the initiation of dismissal proceedings.

---

[3] Following receipt of Lehrman's report of May 12, 2014, Hanes sent a letter to Appellant dated May 22, 2014 entitled "Notice of Initiation of Process for Dismissal from University Employment". Penn State's Motion for Summary Judgment, 7/18/19, at Exhibit J. This letter gave Appellant notice of the initiation of the dismissal process pursuant to HR-70 and the reasons for seeking his dismissal. The letter also advised Appellant of his right to respond in writing, at a meeting, or both. Appellant chose both.

*Id.* at 16. Penn State maintains that Appellant's termination complied with the requirements set forth in HR-70 and that Appellant is attempting to "secure a *de novo* judicial review of the merits of his termination under the guise of a good faith argument." *Id.* at 18 (citation omitted).

The trial court set forth its rationale for granting summary in favor of Penn State as follows:

> There is no dispute between the parties that the "contract" at issue in this matter is [HR-70,] which was in effect at the time of [Appellant's] termination from employment by [Penn State.]
>
> There is also no dispute that, under Pennsylvania Law, [Appellant] is "not entitled to litigate the merits of his termination in this breach of contract action, the question of whether his misconduct should have resulted in the forfeiture of tenure having been conclusively and finally decided" as a result of the process conducted pursuant to HR-70. [***See Murphy***, 777 A.2d at 434.]
>
> . . .
>
> [Appellant] argues that [Penn State] failed to comply with HR-70's terms in two ways: (1) The conducting of an "ambush interview" of [Appellant] by [Lehrman] and (2) A breach of the "duty of good faith" in [Penn State's] "performance" of the contract.
>
> It is undisputed that when [Appellant] was summoned to the office of Albert Lozano, [] Director of Academic Affairs at Penn State's Wilkes-Barre Campus, [("Lozano")] on March 20, 2014, he was given no advance notice that he was going to be interviewed by [] Lehrman regarding the allegations of sexual harassment that had been [leveled] against him. [Appellant] asserts that this "ambush interview" violated the HR-70 process[,] which required that [Appellant] be "provided with written notice from the administrator(s) of the alleged misconduct." [Penn State] counters that the notice provisions of HR-70 were not implicated until the "dismissal process" was initiated and that [] Lehrman's interview of [Appellant] was part of the "investigation" process that was being conducted in an effort to determine whether [Penn State] should pursue a termination of [Appellant's] employment[,] or not. Upon a close reading of HR-70, the [trial c]ourt agrees

with [Penn State] that the notice provision of HR-70 does not apply to an "investigatory process" but, rather, to the "initiation of dismissal process" should an investigation warrant it. In the present case, the [trial c]ourt concludes that the event that triggered the applicability of HR-70's notice and subsequent procedures was the post-investigation decision encompassed in the May 22, 2014 letter from [] Hanes to [Appellant] entitled "Notice of Initiation of Process for Dismissal from University Employment."

With the exception of [] Lehrman's initial interview, [Appellant] does not seriously question whether the other procedures set forth in HR-70 were followed, rather he asserts that they were not conducted in "good faith." As the **Murphy** Court stated, "when an employer expressly provides in an employment contract for a comprehensive evaluation and review process, a court may look to the employer[']s good faith to determine whether the employer has[,] in fact[,] performed those contractual duties." **Murphy**, 777 A.2d at 434, *quoting* **Baker v. Lafayette**, 504 A.2d 247, 255 (Pa. Super. []1986). "The duty of good faith has been defined as honesty in fact in the conduct or transaction concerned." **Creeger Brick and [Bldg.] Supply, Inc. v. Mid-State Bank and Trust Co.**, 560 A.2d 151, 153 (Pa. Super. []1989). A review of the entire record, including [Appellant's] Answer and Exhibits in response to [Penn State's] Motion for Summary Judgment, leaves the [trial c]ourt little doubt that [Penn State] carefully and precisely followed the process set forth in HR-70 and that no genuine issue of material fact has been raised by [Appellant] on which a jury could reasonably conclude that [Penn State] did not act in "good faith."

Trial Court Opinion, 3/20/20, at 3-6 (original ellipses and original brackets omitted).

In order to address the merits of Appellant's issue, we must first look at the requirements set forth in HR-70 to determine the obligations of the parties involved. HR-70 states, in pertinent part, as follows:

**PURPOSE:**

This policy is written to define the conditions and procedures under which tenured faculty members . . . may be dismissed from [Penn State] on grounds of adequate cause[.]

. . .

**ADEQUATE CAUSE:**

A tenured [] faculty member may be dismissed for adequate cause as determined in accordance with this policy. Adequate cause shall mean any one of the following: (i) lack of competence or failure to perform in relation to the functions required by the appointment, (ii) excessive absenteeism, (iii) moral turpitude, or (iv) grave misconduct. . . .

**INITIATION OF DISMISSAL PROCESS**

**A. The Steps That Shall be Followed to Initiate the Dismissal Process**

1. Within a reasonable time after the occurrence of events that might give rise to termination for adequate cause are made known to the appropriate administrator(s), the faculty member will be provided with written notice from the administrator(s) of the alleged misconduct constituting adequate cause. The notice shall include a copy of or references to this HR-70 policy and sufficient information concerning the allegations to enable the faculty member to make a meaningful response.

2. The faculty member will be given an opportunity to respond to the allegations either in writing or at a meeting with the appropriate administrator(s), or both, at the discretion of the faculty member against whom allegations of misconduct have been made. The affected faculty member shall be accorded a reasonable amount of time to prepare a response to the allegations.

3. The faculty member shall have the opportunity to meet with the appropriate administrator(s) and he or she will be given an explanation of the alleged misconduct. The administrator, at his or her discretion, may respond to the written submissions of the faculty member at this meeting. The appropriate ombudsman shall be present as an objective, informational resource at the meeting unless the faculty member waives, in writing, the right to have the

ombudsman present. The meeting may be continued at the discretion of the administrator(s) should there be a need for additional time to resolve the matter or to obtain additional information or otherwise for other good cause.

4. Following this meeting, the faculty member will again be given an opportunity to respond in writing to the administrator(s).

## B. Process After Initial Meeting

The purpose of the meeting(s) and responses listed above is to provide both parties with an understanding of the other party's position, as well as an opportunity to settle the matter without formal action.

1. If after the initial meeting an agreement is reached between the appropriate administrator(s) and the faculty member, then the matter will be resolved in accordance with the agreement.

2. If after the initial meeting(s) the matter remains unresolved, the appropriate administrator(s) may choose to dismiss the matter if no serious concerns remain regarding the faculty member's alleged misconduct. If serious concerns remain, the appropriate Dean will consult with the Executive Vice President and Provost about what further action, if any, should be taken.

## C. Referral to Standing Joint Committee on Tenure

If both the Dean and the Executive Vice President and Provost concur that the disciplinary sanction of termination for adequate cause is warranted under the circumstances, the matter will be referred to the Standing Joint Committee on Tenure. The Dean will promptly advise the faculty member of that determination in writing by letter addressed to the affected faculty member and the Standing Joint Committee on Tenure. The Dean's letter shall set forth the specific basis for seeking adequate cause termination and the specific conduct which serves as the basis for the termination. Such written notification will advise the faculty member that the matter will be referred to the Standing Joint Committee on Tenure, unless the faculty member requests the opportunity to resign *in lieu* of termination.

. . .

**E.  Burden of Proof**

The burden of proof that adequate cause exists for the dismissal of the faculty member [] rests with [Penn State] and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

**STANDING JOINT COMMITTEE ON TENURE:**

- **Role of the Committee**

    The Standing Joint Committee on Tenure acts solely in an advisory capacity to the President on matters pertinent to the dismissal of tenured [] faculty.  It holds hearings to receive evidence and adjudicate the matter and to provide the President with a reasoned opinion and recommendation for action with respect to the request to dismiss a faculty member.  The Standing Joint Committee on Tenure shall exercise its obligations in accordance with the procedural rules described in this HR-70.

- **Establishment of the Committee**

    The Standing Joint Committee on Tenure shall consist of five members: two members selected by the administration, and three tenured faculty members selected by the elected faculty members of [Penn State's] Senate.  The Chair will be chosen by the Committee from the elected tenured faculty members.

- **Committee Procedural Rules**

    1. **Preliminary Evaluation.**  The Standing Joint Committee on Tenure will first evaluate whether or not the charges of misconduct described in the Dean's letter, if true, constitute adequate cause for dismissal.  If the Committee rules that the charges, taken as true, do not constitute adequate cause for dismissal, the Committee will issue a pre-hearing report, recommending to the President that no further proceedings occur.  If the President agrees with the Committee's pre-hearing report, he or she will terminate the dismissal process. However, should the President disagree with this initial determination, he or she shall so notify the Standing Joint Committee on Tenure and the Standing Joint

Committee on Tenure shall, promptly upon receipt of this notice, conduct the hearing described below.

Should the Standing Joint Committee on Tenure rule that the charges may, if proven, constitute adequate cause for dismissal, the hearing will be conducted and all parties will be notified in writing.

2. **Commencement of Hearing.** The faculty member against whom dismissal is sought shall have the opportunity to be heard and present his or her own defense before the Standing Joint Committee on Tenure. The Standing Joint Committee on Tenure shall convene a hearing within sixty (60) days, if reasonably possible, after the date of the Dean's letter referring the matter to the Committee. The hearing shall be limited to the matters described in the letter relating to the grounds on which termination of the faculty member is sought. Except in extenuating circumstances and subject to the concurrence of both parties, all members of the Committee must be present when the Committee meets at the hearing, including any continuance of the hearing, and during all deliberations of the Committee in connection with the hearing.

. . .

4. **Presiding Official.** The Committee Chair shall conduct the hearing and the subsequent deliberations of the Committee.

. . .

12. **Committee Recommendations.** At the conclusion of the hearing, the Committee shall close the record and meet in executive session, along with the Committee's legal advisor, in order to deliberate. There shall be no post-hearing submissions by either party, unless directed by the Committee. The Committee shall issue a report on the hearing to the President, with a copy to the faculty members and the appropriate Dean, within 30 days from the date of completion of the hearing, unless extenuating circumstances require otherwise. The report shall set forth the Committee's findings based on the evidence presented at the hearing and its recommendation with respect to termination for adequate cause. Where the

conclusion of the Committee is not unanimous, the report must fairly reflect the minority views expressed by the members. Dissenting or concurring opinions may be included at the request of any Committee member.

13. **Final Decision by President.** The President shall be the final decision-maker in all cases considered by the Standing Joint Committee on Tenure. The President shall notify the faculty member, the Standing Joint Committee on Tenure, and the appropriate Dean of his or her decision in writing. Once the President has made a final determination as to whether adequate cause for termination exists, the matter shall be closed and not subject to further review.

Appellant's Amended Complaint, 10/4/16, at Exhibit "A".

Here, the record demonstrates that on March 3, 2014, a "Penn State Sexual Harassment/Discrimination/Violence Report Form" was filed with Penn State administration on behalf of an undergraduate student and against Appellant alleging that Appellant sexually harassed the student in violation of Penn State's "Policy AD85 - Discrimination, Harassment, Sexual Harassment and Related Inappropriate Conduct" ("AD-85").[4] **See** Appellant's Amended Complaint, 10/4/16, at ¶¶ 8, 24, 37; **see also** Penn State's Motion for Summary Judgment, 7/18/19, at "Doc. 7", pages 234-237. On March 20, 2014, Lozano arranged, *via* an email,[5] for Lehrman, who was responsible for

_____

[4] AD-85 defines "sexual harassment" as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwanted, inappropriate, or unconsented to." **See** Appellant's Amended Complaint, 10/4/16, at Exhibit "B".

[5] Lozano's email to Appellant stated, "I need to talk with you regarding an academic matter. I will appreciate if you can come to see me tomorrow[,

investigating sexual harassment complaints,[6] to meet with Appellant the next day, but did not himself take part in the meeting. On May 12, 2014, Lehrman authored a report to the Chancellor of Penn State's Wilkes-Barre Campus, recommending that dismissal proceedings be initiated against Appellant in connection with the sexual harassment allegations. On May 22, 2014, Hanes provided Appellant written notice that Penn State was initiating the process for dismissal of Appellant from his employment. The letter, in pertinent part, stated, "In accordance with the provisions of [HR-70], a copy of which is enclosed, I am writing to advise you that this letter initiates the process for your possible dismissal from [Penn State] employment, including your tenured faculty appointment." *See* Hanes Letter, 5/22/14, at unnumbered page 1. The letter advised Appellant that he could respond to the notice either in writing, or at a meeting with Hanes, or both. *Id.* Appellant filed a written response to Hanes's letter on June 17, 2014, and met with Hanes and Larson on July 3, 2014. Thereafter, Hanes and Larson authored a joint letter to the SJCT on August 11, 2014, recommending that Penn State terminate

---

Friday, March 21, 2014.] *See* Appellant's Brief in Opposition to [Penn State's] Motion for Summary Judgment, 12/4/19, at Exhibit "C".

[6] AD-85 states that "concerns about conduct by an employee [] that may violate this policy" should be reported to Lehrman. *See* Appellant's Amended Complaint, 10/4/16, at Exhibit "B".

Appellant's employment.[7]  On August 28, 2014, the SJCT notified Appellant that it was conducting a preliminary evaluation of the sexual harassment allegations and possible termination of Appellant's employment.  The letter also notified Appellant that a hearing on the matter was set for September 16, 2014, and October 1, 2014.  On September 9, 2014, the SJCT notified Appellant that after conducting a preliminary evaluation, it determined there was cause for termination if the allegations were substantiated.  After conducting a hearing on the matter, at which Appellant was present, represented by counsel, and able to offer witness testimony and other evidence in his defense, the SJCT set forth its findings of fact and conclusions in a letter to Barron, Penn State's President, recommending the termination of Appellant's employment.  On November 20, 2014, Barron notified Appellant that his employment with Penn State was terminated effective immediately.

Based upon a review of the record, we concur with the trial court that no genuine issue of material fact existed as to whether Penn State acted in good faith and followed the policies and procedures as set forth in HR-70 when it terminated Appellant's employment.  It is axiomatic that prior to initiating any formal proceedings or charges against Appellant, Penn State needed to perform due diligence in determining the veracity of the sexual harassment allegations.  To do otherwise, and accept the allegations of sexual harassment

---

[7] Nicholas P. Jones, Penn State's Executive Vice President and Provost, concurred in the recommendation set forth in the joint letter to the SJCT.

on their face and immediately begin formal termination proceedings without first performing an investigation into the veracity of the allegations, could irrevocably damage a person's reputation, both professionally and personally, if the allegations were proven false, and could lead to the potential for false accusations being brought by a student as a retaliatory action for dissatisfaction with a faculty member.

Appellant argues that the notice of the alleged misconduct constituting adequate cause of dismissal of a tenured faculty member "shall include a copy of or reference to [the] HR-70 policy and **sufficient information concerning the allegations** to enable the faculty member to make a meaningful response." Appellant's Brief at 16 (original emphasis omitted, emphasis added). In so arguing, Appellant implies that Penn State is required to formulate a substantiated, independent basis, *i.e.* "sufficient information concerning the allegations," upon which to articulate its position. Because Penn State must have "sufficient information concerning the allegations" in order to articulate its position on the alleged misconduct constituting adequate cause for dismissal, Appellant and the HR-70 policy tacitly recognize that investigation prior to notice is essential. Initiating formal termination proceedings without first conducting an investigation is analogous to charging a defendant with a crime before the police investigate and obtain evidence of culpability.

Here, prior to beginning formal termination proceedings pursuant to HR-70, Lehrman, who was charged with investigating allegations of sexual

harassment, performed an investigation into the sexual harassment allegations brought against Appellant by, *inter alia*, meeting with Appellant and speaking with other individuals. Subsequent to the conclusion of Lehrman's investigation, Hanes, Dean of University College, provided Appellant with written notice of the sexual harassment allegations and provided Appellant with a copy of HR-70, pursuant to Step A(1) of the "Initiation of Dismissal Process" section of HR-70. We concur with the trial court that there is no genuine issue of material fact "that the event that triggered the applicability of HR-70's notice and subsequent procedures was the post-investigation decision encompassed in the May 22, 2014 letter from [] Hanes to [Appellant] entitled 'Notice of Initiation of Process for Dismissal from University Employment.'"

The essence of Appellant's argument is not that Penn State unreasonably delayed notice of the alleged misconduct that gave rise to the adequate cause to initiate termination proceedings but, rather, that the notice should have preceded the March 21, 2014 meeting between Lehrman and Appellant. Appellant's Brief at 12-17 For the reasons discussed *supra*, HR-70 required Penn State to investigate the veracity and circumstances of the sexual harassment allegations, first, in order to gain "sufficient information concerning the allegations" and then to apprise Appellant, in a HR-70 notice, of Penn State's position and to provide Appellant an opportunity to respond. Compliance with HR-70 is achieved so long as notice is sent within a reasonable time after an appropriate administrator learns of the "adequate

cause" event. **See** HR-70 at § A(1). HR-70 does not require that notice be sent to the faculty member **before** a first or subsequent investigative interaction, such as the meeting between Lehrman and Appellant.

Here, Lehrman met with Appellant as part of the investigative process on March 21, 2014. Lehrman composed a report based upon his investigation recommending that termination proceedings be initiated against Appellant and sent that report to Hanes on May 12, 2014. Hanes subsequently provided Appellant with notification pursuant to HR-70 on May 22, 2014. Ten days elapsed between Lehrman's report substantiating the occurrence of events that might give rise to termination for adequate cause and Hanes's HR-70 notice, a time period which certainly complies with the requirement that HR-70 notice be provided "within a reasonable time after the occurrence of events that might give rise to termination for adequate cause **are made known** to the appropriate administrator[.]"

We further concur with the trial court that no genuine issue of material fact exists as to whether Penn State acted in good faith in performing its contractual obligations pursuant to HR-70. Appellant contends that Penn State acted in bad faith because (1) Hanes and Larson failed to question him about the conflicts between the sexual harassment allegations, as stated in Lehrman's report to the Chancellor, and his version of events, as set forth in his response letter, (2) the SJCT chairperson was inadequately trained and had a conflict of interest, both of which, Appellant asserts, prevented the faculty member from serving as the chair, and (3) a draft of Appellant's

termination letter was prepared the day after the SJCT sent its recommendation to Penn State's president. With regard to Appellant's first contention, HR-70 states that "[t]he administrator, **at his or her discretion**, may respond to the written submissions of the faculty member at the meeting" and the purpose of the meeting was "to provide both parties with an understanding of the other party's position[.]" *See* HR-70 at §§ A(3) and B (emphasis added). There is no requirement that the administrators, in this case Hanes and Larson, were required to discuss the merits of the allegations or Appellant's response. The purpose of the meeting was to make Appellant aware of Penn State's position on the matter.

Regarding the qualifications for the chairperson of the SJCT, HR-70 states that the SJCT "shall consist of five members: two members selected by the administration, and three tenured faculty members selected by the elected faculty members of [Penn State's] Senate. The Chair will be chosen by [the SJCT's members] from the elected tenured faculty members." *See* HR-70 at "Establishment of the Committee." HR-70 does not set forth any qualifications necessary for a tenured faculty member to be elected as chair of the SJCT other than the requirement that the person must be one of the three tenured faculty members elected by Penn State's Senate to the SJCT and cannot be one of the two members selected by the administration.[8] *Id.*

_____

[8] We, furthermore, find no record support for Appellant's bald assertion that the chair was unqualified to serve in this position because one of the witnesses

Finally, Appellant's allegation that a termination letter was drafted for review by Penn State's president within one day of receiving the SJCT's recommendation to terminate Appellant's employment does not give rise to a genuine issue of material fact as to whether Penn State acted in good faith. Given the seriousness of sexual harassment allegations and the need to remove harassers where adequate cause for termination has been found, the speed in which Penn State acted on this matter by drafting a termination letter for the president's review does not amount to an act of bad faith. Rather, given the urgency with which such matters are to be resolved, as demonstrated by the time restrictions set forth in HR-70, Penn State's quick action in drafting the termination letter amounts to a good faith effort to bring resolution to the matter.

In viewing the evidence in the light most favorable to Appellant, as the non-moving party, the evidence demonstrates that Penn State properly initiated the dismissal proceedings *via* Hanes's May 22, 2014 letter, and that Penn State, in good faith, followed the policies and procedures outlined in HR-70. Therefore, Appellant failed to demonstrate the existence of a genuine issue of material fact.

---

was the chairperson's "boss's boss." The SJCT is comprised of five members who are tasked with making a joint recommendation to Penn State's president, who is ultimately the final decision-marker, regarding the potential termination of the faculty member's employment. Here, the SJCT's recommendation to terminate Appellant's employment was unanimous.

Based upon a review of the record, we discern no error of law or abuse of discretion in the trial court's order granting summary judgment in favor of Penn State.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2020